[Nos. A114510, A114981. First Dist., Div. Three. June 11, 2008.]

FRANCISCA AMARAL et al., Plaintiffs and Appellants, v.
CINTAS CORPORATION NO. 2 et al., Defendants and Appellants;
CITY OF HAYWARD, Intervener and Respondent.

Counsel

Altshuler Berzon, Michael Rubin, Scott A. Kronland and Eileen B. Goldsmith for Plaintiffs and Appellants.

Patrick Whitnell and Kourtney C. Burdick for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Plaintiffs and Appellants.

Squire, Sanders & Dempsey, Mark C. Dosker, Diane L. Gibson and Michael W. Kelly for Defendants and Appellants.

Michael J. O'Toole, City Attorney, and Daniel S. Connolly, Assistant City Attorney, for Intervener and Respondent City of Hayward.

**Opinion**

**McGUINESS, P. J.**—These appeals concern the constitutionality and application of a living wage ordinance enacted by the City of Hayward (City) and incorporated into its municipal contracts. Although Cintas[1] entered into such contracts with the City, it did not provide the minimum wages or benefits required by the ordinance to employees who worked in the company's stockroom or laundry production facilities, which are located outside of the City. Plaintiffs, representing a class of such employees, sued Cintas for violations of the living wage ordinance, Labor Code section 200 et seq., Business and Professions Code section 17200 and breach of contract. The trial court rejected Cintas's challenges to the constitutionality of the ordinance and, on cross-motions for summary judgment or summary adjudication, found that Cintas violated the ordinance, breached its contracts with the City, and violated several Labor Code provisions as well as Business and Professions Code section 17200. The court awarded back wages and unpaid benefits, imposed penalties for the Labor Code violations pursuant to the Labor Code Private Attorneys General Act of 2004 (Lab. Code, § 2698 et seq.), and awarded plaintiffs statutory attorney fees and costs. Cintas challenges nearly every aspect of these rulings on appeal. In separate cross-appeals, plaintiffs dispute the trial court's finding that Cintas's conduct was not "willful," challenge the court's calculation of penalties, and claim they are entitled to recover additional costs.

We conclude the trial court correctly decided all of the numerous legal issues presented. Accordingly, we affirm the judgment and postjudgment orders in their entirety.

---

[1] Cintas is used as a collective reference to defendants, Cintas Corporation No. 2 and Cintas Corporation No. 3.

## BACKGROUND

During the period from July 1999 through the end of June 2003, the City contracted with Cintas for certain uniform and linen services. Cintas leased the City a variety of uniform garments as well as janitorial items such as shop towels and other towels, mops and industrial floormats. Cintas drivers collected soiled items from various City departments every week and delivered them to a Cintas facility for laundering. During the contract period, items from the City were processed at Cintas plants located in Union City and San Leandro. Cintas production workers would first unload items from the truck and sort them into bins by category (i.e., garments, towels and mats). The items were not separated by customer; instead, the garments and other items collected from the City were mixed with items from multiple other Cintas customers. Next, the items would be laundered, steamed or pressed (as necessary), inspected for damage, sorted again, and loaded back onto trucks for delivery. Cintas also maintained a stockroom in San Leandro. Stockroom workers filled requests for replacement garments, repaired damaged garments, and either applied or removed customer-requested logos and labels for the garments. Like production workers, Cintas employees in the stockroom worked on items for many different customers each day.

In April 1999, the City adopted the Hayward Living Wage Ordinance (LWO). (Hayward Ord. No. 99-03, adding ch. 2, art. 14, § 2-14.010 et seq. to Hayward Mun. Code.) In connection with this ordinance, the Hayward City Council made the following findings: "a. The City awards many contracts to private firms which provide services and labor to City government and to the public. [¶] b. Experience indicates that many City contractors who provide services and labor pay their employees . . . wages at or slightly above the minimum required by federal and state minimum wage laws. [¶] c. Payment of inadequate compensation does not provide affected employees with resources sufficient to afford a decent standard of living in Hayward. [¶] d. The City intends to require contractors to provide a minimum level of compensation that will improve the level of services rendered to and for the City. [¶] e. Based upon public comment, testimony and studies, the City Council finds that the wage levels set by this ordinance are minimum compensation levels required to afford a decent standard of living in Hayward." (Hayward Ord. No. 99-03, at § 1.)

The LWO, which applies to all service contracts entered with the City on or after July 1, 1999, requires covered contractors to pay their employees at least $8 per hour if health benefits are provided, or $9.25 per hour if no health benefits are provided. (Hayward Mun. Code, § 2-14.020, subds. (a),

(c).)[2] The ordinance defines "employee" as "any individual employed by a service contractor on or under the authority of any contract for services with the City or proposal for such contract." (Hayward Mun. Code, § 2-14.010, subd. (c).) A "service contract" triggering obligations under the LWO is defined as "any contract with the City, including a purchase order," involving an expenditure in excess of $25,000 for any of several enumerated services, including "[j]anitorial and custodial" services and "[l]aundry services." (Hayward Mun. Code, § 2-14-010, subd. (f).)[3]

Two months before the ordinance went into effect, the City's purchasing manager Ralph Costa sent Cintas a complete copy of the newly adopted LWO. In the facsimile cover sheet for this transmission, Costa reminded Cintas that the City intended to "add language to the renewal PO [purchase order] indicating that the contract is subject to the requirements of the ordinance." On June 9, 1999, the City followed up with a form letter stating that the City's renewable purchase order with Cintas was subject to the LWO and explaining the LWO's requirements. The letter asked vendors to indicate whether they would comply with the ordinance, warning that a refusal to comply would result in the vendor's contract or purchase order being cancelled. Dion Doshier, the general manager of Cintas's Union City plant, checked a box certifying that Cintas would comply with the LWO and returned the signed letter to the City. Doshier did not recall reading the LWO when he first certified that Cintas would comply with it. He did not discuss its requirements with a representative of the City or with anyone at Cintas; rather, Doshier assumed the contract was being renewed under the same terms and conditions as had previously applied.

The following year, on June 2, 2000, the City sent a letter informing Cintas of the new hourly minimum wages required under the LWO (based on cost of living adjustments). Once again, a representative of Cintas signed and returned the letter, certifying that Cintas would comply with the LWO.[4] In addition, purchase orders from the City covering the period from July 1, 1999, through June 30, 2003, were stamped with the statement, "CINTAS agrees to comply with The City of Hayward Living Wage Ordinance . . . ."[5]

---

[2] These hourly rates would be adjusted annually to reflect changes in the Bay Area Consumer Price Index. (Hayward Mun. Code, § 2-14.020, subd. (c).)

[3] Amici curiae League of California Cities and California State Association of Counties request that we take judicial notice of the provisions of nine different living wage ordinances adopted by other California cities and counties. Because the terms of other local laws are not relevant to the issues on appeal, the request is denied.

[4] This time the certification was made by the service manager of Cintas's San Leandro facility. Cintas closed its Union City facility in January 2000; thereafter, the City's contract was serviced out of San Leandro.

[5] The record includes copies of three of these purchase orders, for the fiscal years 1999–2000, 2000–2001 and 2002–2003. Although the purchase order covering the period from

Meanwhile, no one at Cintas contacted the City with questions about its requirements or applicability.

In late May 2003, the City contacted Cintas about renewing its purchase order. When Matthew Ketchem, the general manager of Cintas's San Leandro plant, reviewed the paperwork forwarded by the City, he noticed statements requiring compliance with the Hayward Living Wage Ordinance. Ketchem asked around throughout the service department, but no one knew what the LWO was and no one had contacted the City to find out. Ketchem contacted his supervisor, a regional vice-president based in Seattle, Washington, and was told to terminate the contract. By letter of July 3, 2003, Cintas terminated its contract with the City. Throughout the period from 1999 to 2003, revenue from the City of Hayward contract constituted less than 1 percent of the total revenue Cintas received from all customers serviced at the Union City and San Leandro facilities.

On June 23, 2003, plaintiffs filed a class action complaint against Cintas based on the company's failure to compensate its Union City and San Leandro employees at hourly rates required by the LWO. The complaint alleged Cintas violated the LWO and associated Labor Code provisions (Lab. Code, §§ 204, 227.3), engaged in an unfair and unlawful business practice (Bus. & Prof. Code, § 17200), and breached its contract with the City of Hayward. After the Legislature enacted the Labor Code Private Attorneys General Act of 2004 (Lab. Code, § 2698 et seq.), which permits aggrieved employees to recover Labor Code penalties that previously could be pursued only by the Labor Commissioner, plaintiffs amended their complaint to seek additional penalties. The trial court certified a class consisting of all production and stockroom workers employed by Cintas at its facilities in Union City and San Leandro between July 1, 1999, and June 30, 2003. The court also permitted the City of Hayward to intervene as a plaintiff.

Early in the proceedings, Cintas moved for summary judgment on the ground that the City lacked authority to regulate wages for work performed outside of Hayward's territorial boundaries. (Cal. Const., art. XI, § 7.) The trial court denied the motion, concluding application of the LWO was a proper exercise of the City's contracting power. After the case proceeded through discovery, on September 23, 2005, the court ruled on cross-motions for summary judgment or summary adjudication filed by Cintas, the City and plaintiffs. Specifically, the court determined the LWO was not unconstitutional on its face or as applied to Cintas and was not so ambiguous as to render the contract between Cintas and the City unenforceable. The court

July 1, 2001, through June 30, 2002, does not appear to be part of the record, Cintas does not dispute that it had a contract with the City during this period or that the contract included an agreement to comply with the LWO.

interpreted the LWO as applying to all hours worked by class members during the contract period and therefore concluded Cintas violated the LWO and Business and Professions Code section 17200 and breached its contract with the City. On these claims, the court awarded plaintiffs $790,489 in unpaid hourly wages and $14,254 in unpaid vacation benefits. The court also rejected Cintas's retroactivity arguments and concluded plaintiffs could rely on the Private Attorneys General Act to obtain Labor Code penalties applicable to conduct that occurred before its enactment. However, because the court determined Cintas's violation of the LWO was not willful, it declined to impose the higher penalty rates plaintiffs sought. The court ordered Cintas to pay a total of $258,900 in penalties for violations of Labor Code former sections 210, 225.5 and section 227.3.

After the parties entered a stipulation to resolve certain matters for purposes of facilitating an appeal (see *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 400–402 [87 Cal.Rptr.2d 453, 981 P.2d 79]), judgment was entered in favor of plaintiffs and the City of Hayward.[6] Cintas filed a notice of appeal from the judgment, and plaintiffs cross-appealed.

Plaintiffs moved to recover their costs and attorney fees, based on Code of Civil Procedure section 1021.5 and fee-shifting provisions of the LWO and Labor Code. This motion was granted in part and denied in part. The trial court awarded fees of $1,199,550, calculated using a lodestar amount of $727,000 and a multiplier of 1.65, plus fees of $60,611 for work on the fee motion itself. The court also awarded $498 in nonstatutory costs but denied plaintiffs' attempt to recover additional litigation expenses. As before, Cintas filed a notice of appeal from the order granting attorney fees, and plaintiffs cross-appealed. We consolidated all of the appeals and cross-appeals for briefing, oral argument and decision.

## DISCUSSION

Most of the issues were summarily adjudicated below based on undisputed facts; accordingly, they are subject to de novo review on appeal. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)

### I. Constitutionality of the LWO

#### A. Extraterritoriality

■ Cintas's first constitutional challenge to the LWO rests on article XI, section 7 of the California Constitution, a provision which Cintas contends

---

[6] The court later corrected the judgment, nunc pro tunc, to place it in the form required by the parties' stipulation.

prohibits attempts by a municipality to exercise power outside its territorial boundaries. However, the language of the provision and cases interpreting it make it clear the prohibition applies only where a local government exercises its regulatory or police power, as opposed to its contracting or proprietary power. (*Burns Internat. Security Services Corp. v. County of Los Angeles* (2004) 123 Cal.App.4th 162, 168 [19 Cal.Rptr.3d 776] (*Burns*).)

Article 11, section 7 states that a "county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) The Supreme Court summarized this provision as meaning: "A municipal corporation has generally no extraterritorial powers of *regulation*. It may not exercise its *governmental functions* beyond its corporate boundaries. [Citations.]" (*City of Oakland v. Brock* (1937) 8 Cal.2d 639, 641 [67 P.2d 344], italics added; see also *Stanislaus Co. etc. Assn. v. Stanislaus* (1937) 8 Cal.2d 378, 383–384 [65 P.2d 1305] [observing that a county's "authority to enact police ordinances for sanitation or health" is as broad as the Legislature's except insofar as it is limited by art. XI, § 7].) However, the court recognized long ago that "municipalities may exercise certain extraterritorial powers when the possession and exercise of such powers are essential to the proper conduct of the affairs of the municipality." (*In re Blois* (1918) 179 Cal. 291, 296 [176 P. 449]; see also *City of Oakland v. Burns* (1956) 46 Cal.2d 401, 407 [296 P.2d 333] ["When a governmental entity is authorized to exercise a power purely proprietary, the law leans to the theory that it has full power to perform it in the same efficient manner as a private person would."].)

It is beyond dispute that City, as a charter city, has the power to enter contracts to carry out its necessary functions and may place conditions or specifications on the bidding for such contracts. (*Carruth v. City of Madera* (1965) 233 Cal.App.2d 688, 695 [43 Cal.Rptr. 855]; see also *First Street Plaza Partners v. City of Los Angeles* (1998) 65 Cal.App.4th 650, 661 [76 Cal.Rptr.2d 626] [the manner in which a city contracts is a "municipal affair" subject to control by the city's charter].)[7] The question we must decide is whether application of the LWO to Cintas is an appropriate exercise of the City's contracting power, or whether it is an inappropriate attempt by the City to extend its police powers extraterritorially. Two cases involving similar challenges to municipal contracts inform our answer.

---

[7] As a charter city, the City also has the constitutional authority to regulate matters that are deemed municipal affairs despite the existence of state laws governing the same subject matter. (*First Street Plaza Partners v. City of Los Angeles, supra*, 65 Cal.App.4th at pp. 660–661; see also *Baron v. City of Los Angeles* (1970) 2 Cal.3d 535, 539 [86 Cal.Rptr. 673, 469 P.2d 353] [in a charter city, "ordinances relating to matters which are purely 'municipal affairs' are not invalid because they are in conflict with general state laws or because state laws have been enacted to cover the same subject"].)

*Alioto's Fish Co. v. Human Rights Com. of San Francisco* (1981) 120 Cal.App.3d 594 [174 Cal.Rptr. 763] (*Alioto's*) concerned a San Francisco municipal ordinance prohibiting discrimination in employment. This provision, which was incorporated into all leases of city-owned land, required contractors to agree that they would not discriminate on the basis of race, color, religion, ancestry, national origin, age, sex or sexual orientation and that they would take affirmative action to ensure applicants were employed and retained in accordance with these nondiscriminatory principles. (*Id.* at pp. 600–601.) Several lessees challenged the ordinance, claiming it was preempted by state antidiscrimination laws. (*Id.* at p. 603.) Although Division Two of this court concluded the Legislature had "[c]ertainly . . . evinced an intent to occupy a major portion of the field of employment discrimination" (*id.* at p. 604), the court upheld the San Francisco ordinance because it was "an exercise of the City's contracting power" (*id.* at p. 605). The court observed: "The ordinance does not ban discrimination in employment but merely prescribes certain provisions in City contracts. Those who find such provisions burdensome may simply refuse to contract." (*Ibid.*)

Although the issue of extraterritorial effects did not arise in *Alioto's*, a more recent decision confirms that such effects do not invalidate an otherwise appropriate exercise of a local government's contracting authority. In *Burns, supra,* 123 Cal.App.4th at page 165, the court considered a challenge under article XI, section 7 of the California Constitution to a Los Angeles County ordinance requiring that parties contracting with the county provide at least five days of paid leave for jury duty to their permanent, full-time employees. Contractors were required to have a written policy to this effect and to certify their compliance with this policy to the county. (*Burns,* at pp. 165–166.) A national provider of security services sought to renew its contracts with the county but certified only that the company would provide the required paid jury duty leave to full-time employees " 'assigned to perform any services on the . . . contract.' " (*Id.* at p. 166.) The county rejected this proposal, determined the provider was not in compliance with the ordinance, and awarded the contracts to another provider. (*Ibid.*) The contractor sued, alleging this determination was based on its refusal to certify that it would provide at least five days of paid jury leave to *all* full-time employees who were California residents, regardless of whether they lived in Los Angeles County or whether they would provide any service under the contracts with the county. (*Ibid.*)

In sustaining the county's demurrer, the trial court in *Burns* concluded the Los Angeles County ordinance was valid "even if interpreted to require contracting parties to provide at least five days of paid jury duty leave to all of its employees who reside in California regardless of whether the employees would be providing service under any County contract." (*Burns, supra,* 123 Cal.App.4th at p. 167.) The appellate court agreed. (*Id.* at p. 172.) Based

on the analysis in *Alioto's*, as well as two federal decisions applying California law,[8] the court in *Burns* considered the determinative question in an extraterritoriality analysis to be whether the challenged ordinance represents an exercise of the municipality's contracting power or its regulatory power. (*Burns, supra*, 123 Cal.App.4th at p. 169.) Because no evidence suggested Los Angeles County was "attempting to enlarge its powers or regulate outside its boundaries under the guise of seeking bids for security services," the court concluded the county was "simply specifying the type of employer with which it wishes to do business," and the ordinance was a permissible exercise of the county's contracting power. (*Id.* at p. 172.)

■ The same is true here. The LWO does not purport to regulate conduct outside of Hayward's boundaries; rather, it specifies certain conduct the City wants its contracting partners to follow. It does not matter, for constitutional purposes, whether contractors may have to perform this required conduct outside the City's boundaries. The point is that the City's only action is proprietary: It is the decision to enter a contract, or not, depending on whether the contractor agrees to pay its employees a living wage. Although the LWO may have extraterritorial effects when contractors must pay a living wage to employees who live or perform work outside of the City, these effects do not render the City's exercise of its contracting power unconstitutional. (See *Air Transport v. City and County of San Francisco, supra*, 992 F.Supp. at p. 1159 [holding city ordinance requiring contractors to pay domestic partnership benefits does not violate California Constitution even though it may have nationwide extraterritorial effects when applied to airlines that contract with the San Francisco International Airport].) Like the Los Angeles ordinance requiring contractors to provide all California employees with paid leave for jury duty (*Burns, supra*, 123 Cal.App.4th at pp. 165, 167–172), the LWO reflects the City's policy decision about the type of employer with whom it wishes to contract. If Cintas did not want to pay its employees the wages specified in the LWO, it could simply have declined to renew its contract with the City (as it eventually did in 2003).

[8] In *S.D. Myers v. City and County of San Francisco* (9th Cir. 2001) 253 F.3d 461, 465–466, an out-of-state contractor challenged a San Francisco ordinance requiring that contractors with the city provide nondiscriminatory benefits to their employees who have registered domestic partners. Among other things, the contractor argued the ordinance violated the California Constitution because it had the effect of regulating conduct outside city boundaries. (*Id.* at p. 473.) The court of appeals disagreed, holding that the ordinance was an exercise of the city's contracting power and not an attempt to exert extraterritorial control. (*Id.* at p. 474.) A similar San Francisco ordinance, requiring that contractors provide equal benefits to their employees' domestic partners, was upheld against an extraterritoriality challenge in *Air Transport v. City and County of San Francisco* (N.D.Cal 1998) 992 F.Supp. 1149, 1159. The district court concluded the ordinance fell within the city's proprietary powers because the only way it reached beyond the boundaries of San Francisco was by placing conditions on who could enter contracts with the city. (*Ibid.*)

Nevertheless, Cintas contends the LWO is not proprietary in nature, but is a veiled attempt by the City to regulate outside its boundaries. Cintas argues the City's goal of helping individuals enjoy a better standard of living in Hayward is a regulatory objective that is unrelated to the City's "market interest" in procuring goods and services. However, Cintas's self-serving characterization of what is in the City's proprietary interest ignores the City Council's express finding that "requir[ing] contractors to provide a minimum level of compensation . . . will improve the level of services rendered to and for the City." (Hayward Ord. No. 99-03, § 1(d).) Thus, the City found enactment of the LWO would serve its proprietary interest in obtaining quality services.[9]

Cintas also argues the regulatory nature of the LWO is belied by the fact that it prescribes more than just contractual remedies in the event of a violation. It is true that, unlike the ordinances at issue in *Burns* and *Alioto's*, the LWO purports to give employees a private right of action against their employer for violation of the LWO. (Hayward Mun. Code, § 2-14.040, subd. (a).) However, it does so by requiring each service contractor to *agree* to submit to a civil action by aggrieved employees. (*Id.*, § 2-14.040, subd. (b).) The requirements of the LWO, and the enforcement mechanisms it provides, reach beyond the City's boundaries only to the extent that outside parties choose to contract with the City. The fact that some enforcement measures, such as employee lawsuits or fines (*id.*, § 2-14.040, subd. (e)), go beyond traditional contract remedies does not convert the City's exercise of contracting power into an extraterritorial regulation. Companies that wish to avoid the LWO's enforcement measures can do so simply by choosing not to bid on service contracts with the City.

B. *Vagueness*

██ Cintas also argues the LWO is so vague that it violates due process under the federal and state Constitutions. "[D]ue process of law is violated by 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.' [Citations.]" (*Britt v. City of Pomona* (1990) 223 Cal.App.3d 265, 278 [272 Cal.Rptr. 724].) Before we consider this constitutional issue, however, we must address Cintas's challenge to a related evidentiary ruling.

---

[9] Although Cintas complains the City Council did not compile evidence to support this finding, "a legislative choice . . . may be based on rational speculation unsupported by evidence or empirical data." (*FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 315 [124 L.Ed.2d 211, 113 S.Ct. 2096].)

### 1. *City Officials' Testimony on LWO Properly Excluded*

In the trial court, Cintas attempted to support its arguments on the vagueness of the LWO and on the interpretation of the LWO, should it be applied, with statements made by City employees. In particular, Cintas relied on statements from acting assistant city manager, Perry Carter, whom the City had designated as its person most knowledgeable for deposition (Code Civ. Proc., § 2025.230) about the interpretation, application and enforcement of the LWO. Among other things, Carter stated in deposition that he could "certainly see" why contractors might find certain aspects of the LWO's application ambiguous. The trial court excluded this evidence on the ground that the statements were inadmissible opinion testimony on a legal issue. Nevertheless, Cintas continues to rely heavily on such testimony and statements made by City officials to support its argument that the LWO is unconstitutionally vague.

The trial court's ruling was correct. Opinion evidence about the meaning of a statute, whether from a lay person or a purported expert, has long been held inadmissible. (*People v. Torres* (1995) 33 Cal.App.4th 37, 45–46 [39 Cal.Rptr.2d 103]; see also *In re Brian J.* (2007) 150 Cal.App.4th 97, 120–121 [58 Cal.Rptr.3d 246].) Whether the LWO is so vague and ambiguous that it offends due process, and how the terms of the LWO should be interpreted, are legal questions for the court to decide, and the opinions of City officials on these matters were of little to no relevance. (See *People v. Torres, supra*, 33 Cal.App.4th at p. 46; see also *County of Yolo v. Los Rios Community College Dist.* (1992) 5 Cal.App.4th 1242, 1257 [7 Cal.Rptr.2d 647] [refusing to defer to opinions of county clerk and economics expert regarding meaning of statutory terms because statutory interpretation is ultimately the responsibility of the court].) Cintas complains the trial court's ruling gave insufficient weight to the fact that Carter was designated to speak as the City's representative in regard to the LWO, but it cites no authority suggesting this designation makes any difference to the admissibility of the evidence. In fact, the law is contrary. "It is well settled that the testimony or opinions of individual members of a legislative body are inadmissible for purposes of interpreting a statute. [Citation.]" (*County of Santa Cruz v. City of Watsonville* (1985) 177 Cal.App.3d 831, 842 [223 Cal.Rptr. 272]; see also *City of Los Angeles v. Superior Court* (1985) 170 Cal.App.3d 744, 752–753 [216 Cal.Rptr. 311] [opinions of individual city council members regarding interpretation of ordinance were not relevant for discovery purposes despite claim that the ordinance was ambiguous].)

### 2. *LWO Not Unconstitutionally Vague*

We turn now to Cintas's claim that the LWO is impermissibly vague.

■ The underlying concern of a vagueness challenge "is the core due process requirement of adequate *notice*." (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1115 [60 Cal.Rptr.2d 277, 929 P.2d 596] (*Acuna*).) "A vague statute cannot be upheld because ' "we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." ' (*Cranston v. City of Richmond* (1985) 40 Cal.3d 755, 763 [221 Cal.Rptr. 779, 710 P.2d 845].) 'A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions . . . .' (*Lockheed Aircraft Corp. v. Superior Court* (1946) 28 Cal.2d 481, 484 [171 P.2d 21].)" (*Ortiz v. Lyon Management Group, Inc.* (2007) 157 Cal.App.4th 604, 613 [69 Cal.Rptr.3d 66].)

■ The Supreme Court has articulated two guiding principles for evaluating vagueness claims. "The first principle is derived from the concrete necessity that abstract legal commands must be applied in a specific *context*. A contextual application of otherwise unqualified legal language may supply the clue to a law's meaning, giving facially standardless language a constitutionally sufficient concreteness. Indeed, in evaluating challenges based on claims of vagueness, the [United States Supreme Court] has said '[t]he particular context is all important.' [Citation.]" (*Acuna, supra,* 14 Cal.4th at p. 1116.) Such context, our high court has observed, properly includes the purpose or objectives that the challenged law was designed to serve. (*Id.* at p. 1118; see also *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1107 [40 Cal.Rptr.2d 402, 892 P.2d 1145].)

■ "The second guiding principle is the notion of '*reasonable* specificity' [citation] or ' " '[r]easonable* certainty.' " ' [Citations.] . . . '[F]ew words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.' [Citation.]" (*Acuna, supra,* 14 Cal.4th at p. 1117.) Thus, " ' "[a] statute will not be held void for uncertainty if any reasonable and practical construction can be given its language." [Citation.] It will be upheld if its terms may be made reasonably certain by reference to other definable sources,' including 'reference to other [statutes or] code provisions' [citations]. Other 'definable sources' also include judicial decisions and common law [citations], legislative history, and other portions of the legislation. [Citations.] Finally, and sometimes most importantly, common sense is also to be considered. [Citations.]" (*Personal Watercraft Coalition v. Marin County Bd. of Supervisors* (2002) 100 Cal.App.4th 129, 139 [122 Cal.Rptr.2d 425].)

In applying these two principles to analyze the LWO, we respect "the strong presumption that legislative enactments 'must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citations.] . . .' (*Lockheed Aircraft Corp.* v. *Superior Court*[, *supra*,] 28 Cal.2d [at p. 484].)" (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 143 [253 Cal.Rptr. 1, 763 P.2d 852]; accord, *Tobe v. City of Santa Ana, supra*, 9 Cal.4th at p. 1107.) Moreover, because the LWO regulates business behavior, constitutional requirements are more relaxed than they are for statutes that are penal in nature.[10] (*Hoffman Estates v. Flipside, Hoffman Estates* (1982) 455 U.S. 489, 498 [71 L.Ed.2d 362, 102 S.Ct. 1186].) "[E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." (*Id.* at pp. 498–499, fns. omitted; see also *Barclays Bank Internat. Ltd. v. Franchise Tax Bd.* (1992) 10 Cal.App.4th 1742, 1759 [14 Cal.Rptr.2d 537] ["Vagueness is less a concern if an enterprise has the ability to clarify the meaning of an economic regulation in advance by resort to an administrative process."].)

Cintas complains of three specific areas of ambiguity in the LWO: (1) whether a service contractor must pay employees the LWO rate for all hours worked, or only for time spent working on a Hayward contract; (2) whether the LWO applies to work performed outside of the City; and (3) whether the LWO applies to employees who do not work "directly" on Hayward projects. These three areas all boil down to questions about how the LWO should be interpreted to apply to the somewhat unusual situation of a service contractor that performed work in geographical locations outside the City and comingled work employees performed on the City's contract with work performed for all other customers. The ordinance itself does not mention where work covered by the LWO is to be performed or which of an employee's hours may or may not be subject to the LWO. It simply states that service contractors such as Cintas[11] must pay their employees certain minimum wages, where "employee" is defined as a person "employed . . . on or under the authority of" a service contract with the City. (Hayward Mun.

---

[10] Enforcement measures for the LWO include a private right of action for aggrieved employees and penalties under Government Code section 36900; however, the ordinance specifically states that a violation may *not* be prosecuted as a misdemeanor. (Hayward Mun. Code, § 2-14.040, subd. (e).)

[11] Although Cintas argued below that it was not a service contractor because it did not provide laundry services, or because the LWO's definition of "laundry services" was unconstitutionally vague, it appears to have conceded this point on appeal.

Code, § 2-14.010, subd. (c).) Thus, the "ambiguities" Cintas complains of do not arise from the language of the LWO itself, but rather from Cintas's attempt to impose limits on the application of the ordinance. As our Supreme Court has explained, however, "the mere fact that a new statute requires interpretation does not make it unconstitutionally vague." (*People v. Hazelton* (1996) 14 Cal.4th 101, 109 [58 Cal.Rptr.2d 443, 926 P.2d 423], fn. omitted.)

In passing the LWO, "[t]he City intend[ed] to require contractors to provide a minimum level of compensation that will improve the level of services rendered to and for the City." (Hayward Ord. No. 99-03, § 1(d), adding ch. 2, art. 14, § 2-14.010 et seq. to Hayward Mun. Code.) In other words, the City wanted employees who provide services to the City under service contracts to be paid a living wage because it believed payment of this wage would improve the quality of services such employees render. The City Council's statement of intent, along with a provision in the LWO stating that the ordinance should be applied to the City's service contracts "[t]o the maximum extent permitted by law" (Hayward Mun. Code, § 2-14.020, subd. (b)), indicates the LWO applies—just as its language states—to *all* employees who work on or under a service contract with the City. There is no inherent vagueness in the statutory language, and adopting the plain meaning of this language serves the broad remedial purpose the City Council evidently intended.

It is true that the terms of the LWO do not spell out precisely how the ordinance will apply in situations where contractors perform work outside of the City or commingle an employee's contract-related work with work for other customers. However, due process "does not . . . require that statutes must be drafted with the precision of a laser." (*Personal Watercraft Coalition v. Marin County Bd. of Supervisors, supra*, 100 Cal.App.4th at p. 138.) " ' "Reasonable certainty is all that is required. . . ." [Citation.] . . .' [Citations]." (*Id.* at p. 139, quoting *American Civil Liberties Union v. Board of Education* (1963) 59 Cal.2d 203, 218 [28 Cal.Rptr. 700, 379 P.2d 4].) Because the LWO authorizes the city manager to develop and implement administrative policies for applying the ordinance (Hayward Mun. Code, § 2-14-050, subd. (a)), the City apparently intended to adopt regulations to clarify how the law applies in various situations. (See generally *Aguiar v. Cintas Corp. No. 2* (2006) 144 Cal.App.4th 121, 125–127 [50 Cal.Rptr.3d 135] [describing a very similar living wage ordinance adopted by the City of Los Angeles and related administrative regulations the city promulgated].) However, the absence of such regulations does not, standing alone, render the LWO unconstitutionally vague. Cintas's argument to this effect rests on a tautology, because "a determination that a statutory scheme cannot be implemented without administrative regulations is essentially [the same as] a

determination that the statutory scheme, standing alone, is too vague or indefinite to be enforced." (*Alfaro v. Terhune* (2002) 98 Cal.App.4th 492, 503 [120 Cal.Rptr.2d 197].)

■ Considering the purpose for which the LWO was enacted, it is " ' "reasonable and practical" ' " to construe its language as requiring payment of a living wage to all employees who perform work for the City under a service contract. (*Personal Watercraft Coalition v. Marin County Bd. of Supervisors, supra*, 100 Cal.App.4th at p. 139; see also *Kumar v. Superior Court* (2007) 149 Cal.App.4th 543, 549 [57 Cal.Rptr.3d 72] [in considering vagueness challenge, court must give statute a liberal, practical and common-sense construction].) Nor are the terms of the LWO so indefinite or esoteric that a person of ordinary intelligence would have to guess at their meaning. (See *Britt v. City of Pomona, supra*, 223 Cal.App.3d at p. 278.) Cintas did not express confusion about the application of the LWO before this litigation, and undisputed evidence indicates that, despite letters inviting questions from contractors about the LWO, Cintas never asked the City what it needed to do to comply with the ordinance. In general, "[a] person wondering whether a contemplated course of conduct is within a statutory prohibition is under a duty of inquiry to determine whether the latter will reach the former." (*Personal Watercraft Coalition v. Marin County Bd. of Supervisors, supra*, 100 Cal.App.4th at p. 139.) We do not consider Cintas's failure to inquire about the LWO to be fatal to its vagueness claim, because no "definable sources" such as regulations or court decisions were available to explain the LWO's application in this specific context (see *ibid.*); however, the company's apparent failure to ask *anyone* about the proper application of the LWO undermines its current claim that the ordinance's terms are hopelessly ambiguous.

## II. *Interpretation of LWO for Class Members' Claims*

Having rejected Cintas's challenges to the constitutionality of the LWO, we now consider whether the trial court properly interpreted the requirements of the ordinance. Because Cintas's claims in this regard raise issues of law, they are subject to de novo review. (*People ex rel Kennedy v. Beaumont Investment, Ltd.* (2003) 111 Cal.App.4th 102, 113 [3 Cal.Rptr.3d 429].)

■ "We interpret ordinances by the same rules applicable to statutes. [Citation.]" (*Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd.* (1999) 70 Cal.App.4th 281, 290 [82 Cal.Rptr.2d 569].) These rules are well established. "When faced with a question of statutory interpretation, we look first to the language of the statute. [Citation.] In interpreting that language, we strive to give effect and significance to every word and phrase. [Citation.]" (*Copley Press, Inc. v. Superior Court* (2006) 39

Cal.4th 1272, 1284–1285 [48 Cal.Rptr.3d 183, 141 P.3d 288].) These words "are to be given their plain and commonsense meaning. [Citation.]" (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103 [56 Cal.Rptr.3d 880, 155 P.3d 284].) ▮ More generally, the Supreme Court has held that "statutes governing conditions of employment are to be construed broadly in favor of protecting employees. [Citations.]" (*Ibid.*; see also *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 702 [166 Cal.Rptr. 331, 613 P.2d 579] [statutes regulating wages, hours and working conditions must be liberally construed to promote their remedial objectives].)

### A. LWO Applies to the Cintas Contracts with Hayward

The City repeatedly advised Cintas, by letter and by statements stamped on the purchase orders, that its contracts with the company were subject to Cintas's compliance with the LWO, and Cintas twice certified that it would comply with the ordinance. Nevertheless, despite its previous promise to comply, Cintas now argues the LWO does not apply to these contracts.

First, Cintas contends the plaintiff class members do not fit the LWO's definition of employees because they rendered a service to Cintas, not to the City. According to Cintas, to be employed "on or under the authority" of a service contract "requires some agreement between the contracting parties as to the employment of individuals." This argument is waived because it was not presented to the trial court.[12] (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 394, pp. 444–445.) It is also nonsensical. The LWO defines a covered employee as "any individual employed by a service contractor on or under the authority of any contract for services with the City . . . ." (Hayward Mun. Code, § 2-14.010, subd. (c).) Plaintiffs were employed by Cintas, a "service contractor." When they laundered and maintained uniforms used by the City, plaintiffs were carrying out Cintas's obligations under service contracts with the City. Accordingly, these employees were working "on or under the authority of" a service contract. It makes no difference that the uniforms themselves were owned by Cintas and not the City; the point is that plaintiffs' work for Cintas provided a service to the City that the City had contracted with Cintas to receive. Since it can be argued that many employees provide services to their employers, not their employers' customers, Cintas's interpretation would render the LWO inapplicable to many, if not all, contractors due to circumstances outside the City's control. Such a result would undermine the broad remedial purpose of the ordinance.

---

[12] Although Cintas claims this point was made in opposition to plaintiffs' motion for summary judgment, the argument it directs us to concerns only whether Cintas provided "laundry services" to the City. Cintas did not attempt to distinguish plaintiffs' service to Cintas from service on or under the contracts with the City.

Second, in an argument that was developed in the trial court but reduced to no more than a parenthetical comment in appellants' opening brief, Cintas suggests the LWO does not apply because Cintas's "leasing of garments and other goods to Hayward, and periodic cleaning" of those items did not constitute "laundry services," as defined in the ordinance. (See Hayward Mun. Code, § 2-14-010, subd. (f) [defining covered service contracts as including, inter alia, contracts for "[l]aundry services"].) This issue also merits little discussion. "A reviewing court need not consider alleged error when the appellant merely complains of it without pertinent argument. [Citation.]" (*Downey Savings & Loan Assn. v. Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072, 1090 [234 Cal.Rptr. 835]; see also *San Mateo County Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 559 [45 Cal.Rptr.2d 117] [issue not supported by argument or citation of authority is waived].) As the trial court observed, Cintas's claim that it did not render "laundry services," or that the term "laundry services" is too vague to be enforceable, is belied by the company's own admission in discovery that it provided "laundry services" under a purchase contract with the City. (See *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 22 [112 Cal.Rptr. 786, 520 P.2d 10] [party is bound by admissions]; see also *Kaufman v. ACS Systems, Inc.* (2003) 110 Cal.App.4th 886, 921 [2 Cal.Rptr.3d 296] [party's admission in discovery makes it "unlikely" the party was "ever in the dark" about the meaning of an allegedly vague term].) Cintas's argument also fails because, as noted above, the company was repeatedly told that its contracts with the City were subject to the LWO and it twice agreed to comply. In light of Cintas's own admissions, as well as the plain language of the statute, the trial court properly concluded the LWO applied to the service contracts between Cintas and the City.

### B. *LWO Covers All Hours of Employees Who Worked on the Contracts*

Cintas next contends plaintiff class members have no claim under the LWO because the ordinance dictates a minimum level of pay *only* with respect to the time an employee spends working on a service contract. According to Cintas, the time any plaintiff spent working on items for the City was de minimis.

We start with the language of the ordinance. "If the statutory language is clear and unambiguous our inquiry ends." (*Murphy v. Kenneth Cole Productions, Inc., supra,* 40 Cal.4th at p. 1103.) The LWO states: "Service contractors subject to this Ordinance shall pay their employees a wage of no less than eight dollars ($8.00) per hour, if health benefits are paid to the employees, or nine dollars and twenty-five cents ($9.25) per hour if no such health benefits are paid." (Hayward Mun. Code, § 2-14.020, subd. (c).)

For purposes of the ordinance, an employee is defined as "any individual employed by a service contractor on or under the authority of any contract for services with the City . . . ." (Hayward Mun. Code, § 2-14.010, subd. (c).) ▉ Considering these two provisions together, the plain language of the ordinance requires contractors to compensate every individual they employ to perform work on or under a service contract with Hayward with a wage of at least $9.25 per hour, or $8 per hour if the employer provides health benefits.

The definition of a covered employee as someone working "on or under the authority of" a service contract limits the scope of a contractor's obligation in one respect, because it means the contractor need not pay all of its employees the required wage, but only those employees who do work for the City. However, no provision of the LWO limits the contractor's obligation further, as Cintas suggests, by mandating a living wage *only* for the time an employee spends performing tasks related to the service contract with Hayward. If the City had intended to restrict the application of the LWO in this manner, it could have easily inserted the phrase "for hours worked on the contract" in the subdivision describing the ordinance's "Living Wage Requirements" (Hayward Mun. Code, § 2-14.020, subd. (c)). (Cf. *Aguiar v. Cintas Corp. No. 2, supra,* 144 Cal.App.4th at p. 127 [describing a regulation limiting application of the Los Angeles living wage ordinance to employees who have worked at least 20 hours during the month on a service contract].) It did not. The LWO provision requiring contractors to give covered employees a minimum number of compensated days off also fails to distinguish between employees based on the amount of time worked on a City contract. (Hayward Mun. Code, § 2-14.020, subd. (d).) This subdivision provides that "[p]art time employees shall accrue such days at a rate proportional to full time employees." (*Ibid.*) If the City had intended to impose the limitation Cintas now urges, it could have stated that employees not fully engaged in work on or under a service contract would also accrue compensated days off at a proportional rate. It did not.

It might also have been possible to infer an intent to restrict the wage requirements to actual hours worked on a service contract if the LWO included any recordkeeping requirements. Because the ordinance does not require contractors to keep track of the amount of time any employee has spent on work related to a service contract with the City, it is reasonable to infer the City intended to require LWO compensation for *all* hours worked by those employees a contractor assigns to work on a City contract. Without such records, it would be impossible for the City to audit a contractor's compliance with the LWO, as Cintas construes it. (See Hayward Mun. Code, § 2-14.040, subd. (d) [giving City authority to "investigate and address" alleged violations].) Cintas's construction would also render the computation of compensated days off (Hayward Mun. Code, § 2-14.020, subd. (d)) confusing or, in the absence of detailed time records, impossible.

The trial court's interpretation—that LWO requirements apply to all hours worked by employees who are covered by the ordinance, and not just hours worked on a City contract—is also most consistent with the remedial purpose of the law. " 'The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.]' (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* [(1987)] 43 Cal.3d [1379,] 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)" (*People ex rel Kennedy v. Beaumont Investment, Ltd., supra,* 111 Cal.App.4th at p. 113.) The City found that it would obtain improved services from contractors whose employees are compensated at a level sufficient to allow them "to afford a decent standard of living in Hayward." (Hayward Ord. No. 99-03, § 1(c).) To this end, the LWO states that its requirements are to be applied "[t]o the maximum extent permitted by law." (Hayward Mun. Code, § 2-14.020, subd. (b).) This is not to say that the City's contractors must necessarily compensate all of their employees in accordance with the LWO. A contractor with many employees might choose to limit its obligations by segregating City contract work and assigning this work to a smaller subset of employees. That it did not occur to Cintas to do so does not require us to reach a different interpretation of the ordinance.

Finally, Cintas again points to statements by City officials as evidence supporting a contrary interpretation of the ordinance. "Only when the statute's language is ambiguous or susceptible of more than one reasonable interpretation, may the court turn to extrinsic aids to assist in interpretation. [Citation.]" (*Murphy v. Kenneth Cole Productions, Inc., supra,* 40 Cal.4th at p. 1103.) Even assuming the language of the LWO is sufficiently ambiguous to permit resort to extrinsic sources of interpretation, such sources do not properly include opinions offered by governmental employees. A court seeking to interpret an ambiguous statute may consult a variety of extrinsic sources, "such as the ostensible objectives to be achieved by the statute, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction and the statutory scheme of which the statute is a part. [Citations.]" (*Id.* at p. 1105.) In contrast, as we have discussed, statements by individuals who may have been involved in the passage of the law are not relevant for the purpose of interpreting the law. (*County of Santa Cruz v. City of Watsonville, supra,* 177 Cal.App.3d at p. 842; *City of Los Angeles v. Superior Court, supra,* 170 Cal.App.3d at pp. 752–753.)

C. *All Class Members Are "Employees" Under the LWO*

In a related point, Cintas complains the trial court erred in shifting the burden to require Cintas to prove which of its employees worked on the City contracts. Cintas asserts there was no showing that any class

member worked for more than a de minimis amount of time on these contracts, and thus Cintas argues no evidence supports a finding that plaintiffs were "employees" entitled to the benefits of the LWO.

Undisputed evidence establishes that Cintas did not separate work related to the City contracts from work performed for other customers. No employees were specifically assigned to process City items, and, since these items were not tagged or identified in any distinct way in the production process, it is impossible to tell in retrospect which Cintas employees performed work on the City contracts. Because work on the City contracts was distributed among all Cintas employees, the general manager of Cintas's San Leandro plant observed that "[a]lmost any production worker might [have] work[ed] on Hayward's laundry or linens." Based on this evidence, the trial court found: "the most likely state of affairs is that every employee in the class worked for some amount of time on the City contract and . . . there is no way of knowing whether the amount of work—in terms of time, revenue generated, pounds of laundry, or any other measurement—was large, small, or non-existent for any given class member." (Fn. omitted.)

Cintas does not dispute the factual basis of this finding. Indeed, the company admitted in response to plaintiffs' summary judgment motion that it has "no records or other data establishing which Union City or San Leandro Class Members worked on Contract Items during the Class Period." Instead, Cintas claims the trial court committed legal error by shifting the burden of proof to it to prove which class members did no work on the City contracts and thus were not entitled to be compensated under the LWO.

 In general, "[e]xcept as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." (Evid. Code, § 500.) On occasion, however, courts may alter the normal allocation of the burden of proof. (*National Council Against Health Fraud, Inc. v. King Bio Pharmaceuticals, Inc.* (2003) 107 Cal.App.4th 1336, 1346 [133 Cal.Rptr.2d 207]; see, e.g., *Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1670 [3 Cal.Rptr.3d 279] [burden of proof on issue of causation will be shifted to the defendant when circumstances make it impossible for the plaintiff to prove its case].) " 'In determining whether the normal allocation of the burden of proof should be altered, the courts consider a number of factors: the knowledge of the parties concerning the particular fact, the availability of the evidence to the parties, the most desirable result in terms of public policy in the absence of proof of the particular fact, and the probability of the existence or nonexistence of the fact.' [Citation.]" (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 660–661 [25 Cal.Rptr.2d 109, 863 P.2d 179].)

■ One long-standing application of burden shifting occurs in the wage and hour context when an employer's compensation records are so incomplete or inaccurate that an employee cannot prove his or her damages. When the United States Supreme Court addressed this problem with regard to claims under the Fair Labor Standards Act of 1938 (29 U.S.C. § 201 et seq.), it observed that the remedial nature of the statute and public policy "militate against making [the evidentiary burden] an impossible hurdle for the employee." (*Anderson v. Mt. Clemens Pottery Co.* (1946) 328 U.S. 680, 687 [90 L.Ed. 1515, 66 S.Ct. 1187] (*Anderson*).) Considering that an employer has a statutory duty to maintain proper records of wages, hours and work conditions and is in the best position to know salient facts about the nature and amount of work performed, the court concluded it is appropriate to shift the burden of proof to the employer. (*Id.* at pp. 687–688.) Specifically, once an employee proves he or she "has in fact performed work" that was improperly compensated, and presents enough evidence to allow an inference as to the amount of this work, the burden shifts to the employer to prove the precise amount of work performed or to negate the inference drawn from the employee's evidence. (*Ibid.*) The high court observed that applying the normal burden of proof in such circumstances would unfairly penalize an employee for the employer's failure to keep proper records and would allow the employer to keep the benefits of the employee's labors without paying full compensation. (*Id.* at p. 687.)

Relying on *Anderson*, California courts have shifted the burden of proof to employers when inadequate records prevent employees from proving their claims for unpaid overtime hours (*Hernandez v. Mendoza* (1988) 199 Cal.App.3d 721, 726–728 [245 Cal.Rptr. 36]) and unpaid meal and rest breaks (*Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 961–963 [35 Cal.Rptr.3d 243]). *Anderson*'s reasoning has also been applied to permit class action plaintiffs to prove their damages for unpaid overtime by the use of statistical sampling. (*Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 746–751 [9 Cal.Rptr.3d 544].)

■ In addition, California has long approved of burden shifting outside the wage and hour context when the parties have unequal access to evidence necessary to prove a disputed issue. " 'Where the evidence necessary to establish a fact essential to a claim lies peculiarly within the knowledge and competence of one of the parties, that party has the burden of going forward with the evidence on the issue although it is not the party asserting the claim.' [Citations.]" (*Sanchez v. Unemployment Ins. Appeals Bd.* (1977) 20 Cal.3d 55, 71 [141 Cal.Rptr. 146, 569 P.2d 740] (*Sanchez*).) In *Sanchez*, the issue concerned an unemployment insurance claimant's ability to prove she was " 'available for work' " in a " 'substantial field of employment.' " (*Id.* at pp. 71–72.) Because this inquiry requires expert testimony about the size and nature of the labor market, facts which are " 'peculiarly within the knowledge

and competence'" of the Department of Employment Development, the Supreme Court concluded it was appropriate to shift the burden of proof on this aspect of the issue to the department. (*Id.* at p. 71.)

It makes sense to apply burden shifting in this case because, as plaintiffs' employer, Cintas is in the best position to know which class members worked on the City contracts and at which times. Although the LWO imposes no recordkeeping requirements as such,[13] the entire aim of the ordinance is to require contractors to pay a living wage to employees who work on service contracts with the City. Thus, if a contractor does not wish to compensate all its employees in accordance with the LWO, the onus is on the contractor to segregate work on City contracts and assign it to specific employees, or at least to keep records of which employees perform contract-related work. Given Cintas's control over workflow and its greater knowledge about the obligations imposed by the LWO, it would be unrealistic and unfair to expect individual class members to prove they performed work related to the City contracts.

Cintas attempts to distinguish the numerous precedents in favor of burden shifting by arguing that in all of these cases the employer had a duty to maintain records, whereas the LWO does not explicitly impose such a duty. However, the underlying rationale for burden shifting is not the employer's duty of recordkeeping but the "fundamental principle of American jurisprudence that for every wrong there is a remedy, and that, unless countered by public policy, an injured party should be compensated for all damage proximately caused by the wrongdoer. [Citations.]" (*Hernandez v. Mendoza, supra*, 199 Cal.App.3d at p. 726.) Where essential facts necessary to proof lie within the exclusive knowledge or control of one party, "fundamental fairness" is what justifies shifting the burden of proof to this party. (*Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 36 [130 Cal.Rptr.2d 860]; see also *Hernandez v. Mendoza, supra*, 199 Cal.App.3d at pp. 726–727 [where fact of damage is certain and only uncertainty concerns the amount of damage, "it would be a perversion of justice to deny all relief to the injured person, thereby relieving the wrongdoer from making any restitution for his wrongful act"].) The court must take account of numerous factors in determining whether it is appropriate to shift the burden of proof (see *Lakin v. Watkins Associated Industries, supra*, 6 Cal.4th at pp. 660–661), and the absence of an express duty of recordkeeping is not dispositive. On the contrary, " 'In determining the incidence of the burden of proof, "the truth is that there is not and cannot be any one general solvent for all cases. It is

[13] The ordinance contemplates the future development of such requirements, however. One provision gives the city manager authority to "monitor compliance, which may include . . . the periodic review of appropriate records maintained by service contractors to verify compliance . . . ." (Hayward Mun. Code, § 2-14.050, subd. (a).)

merely a question of policy and fairness based on experience in the different situations." ' [Citations.]" (*Wolf v. Superior Court, supra*, 107 Cal.App.4th at pp. 35–36; cf. *Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1193–1194 [77 Cal.Rptr.2d 537, 959 P.2d 1213] [burden shift not appropriate where it would impair public policy and take burden away from the party with superior knowledge and information on the issue].)

In addressing the exact same facts regarding Cintas's failure to segregate work to comply with a living wage ordinance, Division Seven of the Second District Court of Appeal relied on the precedents we have discussed and concluded burden shifting was appropriate. (*Aguiar v. Cintas Corp. No. 2, supra*, 144 Cal.App.4th at pp. 134–135.) The Los Angeles ordinance in question applied only to employees who had worked at least 20 hours per month on a covered contract, and Cintas argued this 20-hour rule created a distinction between the plaintiffs sufficient to defeat treatment of their claims in a class action. (*Id.* at pp. 133–134.) The appellate court concluded this difference could be remedied by use of subclasses, and it went on to note that the problem of identifying which employees are covered by the ordinance would rightly fall on Cintas: "To the extent questions arise later in the litigation about how to determine which putative class members worked at least 20 hours per month on the DWP [Department of Water and Power] contracts, or whether their schedules varied from month to month, *that burden falls on Cintas.* It was Cintas's business decision to commingle DWP items with those of other customers and to allow all employees to work on the items at each substation (for example, sorting, hanging, folding) as they were processed through the plant." (*Id.* at p. 134, italics added.) Because Cintas's business decision likewise created the difficulty of determining which class members worked on the City contracts in this case, we too conclude Cintas must bear the burden of proof on the issue. In other words, Cintas has the burden of negating the inference plaintiffs established that they worked on the City contracts and were thus covered by the LWO.

Finally, we reject Cintas's assertion that the LWO does not apply at all because the evidence suggests no individual class member worked more than a de minimis amount on items related to the City contracts. The LWO contains no exception to its requirements when the amount of an employee's work on a contract is arguably very small or de minimis. Because it would contradict both the language and the purpose of the LWO, we decline to read such an exception into the ordinance.

III. *Enforceability of the Contracts*

Cintas next contends the trial court erred in granting summary judgment on plaintiffs' breach of contract claims. In entering purchase contracts with the

City during the relevant timeframe, Cintas agreed to comply with the LWO. Cintas now argues the LWO's terms are too uncertain for this contractual promise to be enforceable. In addition, Cintas asserts plaintiffs cannot recover for breach of this promise because plaintiffs were not intended third party beneficiaries of Cintas's contracts with the City. Neither of these arguments has merit.

### A. Uncertainty of Contract Terms

Cintas's challenge to the enforceability of the contracts rests on its claim that the terms of the LWO are unconstitutionally vague. We have rejected this constitutional claim, however, because the meaning of the LWO can be ascertained with reasonable certainty. (See *Acuna, supra,* 14 Cal.4th at p. 1117.) For the same reason, Cintas's challenge to the enforceability of the contracts must fail.

■ "Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable. [Citations.]" (*Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 481 [289 P.2d 785].) For example, in *Ladas v. California State Auto Assn.* (1993) 19 Cal.App.4th 761, 770–771 [23 Cal.Rptr.2d 810], an employer's promise to "consider" commission rates paid by other insurers in setting its agents' compensation was found too amorphous under the circumstances of the case to give rise to a contractual duty. However, "the modern trend of the law favors carrying out the parties' intentions through the enforcement of contracts and disfavors holding them unenforceable because of uncertainty. [Citations.]" (*Okun v. Morton* (1988) 203 Cal.App.3d 805, 817 [250 Cal.Rptr. 220].) As our Supreme Court long ago observed, " 'The law does not favor but leans against the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained.' [Citations.]" (*Cal. Lettuce Growers v. Union Sugar Co., supra,* 45 Cal.2d at p. 481.) In one application of this principle, the Supreme Court concluded an employer's implied promise not to demote an employee without good cause was not unenforceably vague because the meaning of "good cause" could be ascertained from other contexts. (*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 466–467 [46 Cal.Rptr.2d 427, 904 P.2d 834].)

Cintas repeatedly agreed to comply with the LWO when it entered into the purchase contracts and sent two separate certifications to the City. As we explained in relation to Cintas's constitutional challenge, the terms of this ordinance were not so vague or uncertain that Cintas could not have understood what its obligations were. The LWO simply requires a contractor

to pay a living wage to employees who work on or under a City contract. Moreover, Cintas's current attempt to imbue the ordinance with uncertainty is belied by the company's failure to seek any clarification from the City about the law's requirements during the contract period.

### B. *Intended Beneficiaries*

Cintas next complains plaintiffs cannot sue to enforce the contractual promise to comply with the LWO because plaintiffs were not intended third party beneficiaries of the contracts with the City. A person who is not a party to a contract may nevertheless enforce it if the contract was made expressly for his benefit. (Civ. Code, § 1559.) For a third party to qualify as a beneficiary of a contract, the contracting parties must have intended to benefit that third party and their intent must be evident in the terms of the contract. (*Jones v. Aetna Casualty & Surety Co.* (1994) 26 Cal.App.4th 1717, 1724 [33 Cal.Rptr.2d 291].) The question here is whether Cintas and the City intended to benefit plaintiff class members when they agreed that, as a condition of the purchase contracts, Cintas would comply with the LWO.

This issue has been addressed by Courts of Appeal in the analogous context of California's prevailing wage law. (Lab. Code, §§ 90.5, 1720–1861.) This law requires that all contractors and subcontractors working on a public works contract must pay their employees the prevailing wage rate for work performed on the contract. (Lab. Code, §§ 1771, 1774.) Although the Labor Code imposes a statutory duty to pay prevailing wages and the prevailing wage law is incorporated into public works contracts, our Supreme Court has not yet decided whether employees have a right to enforce the prevailing wage law absent a specific provision in their employment contracts. (*Department of Industrial Relations v. Fidelity Roof Co.* (1997) 60 Cal.App.4th 411, 425 [70 Cal.Rptr.2d 465] (*Fidelity Roof*); see *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 969, fn. 5 [9 Cal.Rptr.2d 92, 831 P.2d 317].) Two appellate court decisions have considered the issue, however, and both conclude aggrieved employees are third party beneficiaries who may sue to enforce a contractor's promise to pay prevailing wages.

In *Tippett v. Terich* (1995) 37 Cal.App.4th 1517, 1531–1532 [44 Cal.Rptr.2d 862][14] Division Two of the Fourth Appellate District concluded statutory remedies for violations of the prevailing wage law are not exclusive. Even absent a provision in their employment contracts promising the payment of prevailing wages, the court held that contractors' employees who are not paid a prevailing wage can sue as third party beneficiaries for their employer's

---

[14] *Tippett v. Terich, supra,* 37 Cal.App.4th 1517, was disapproved on another ground in *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163 [96 Cal.Rptr.2d 518, 999 P.2d 706].

breach of the public works contract. (*Tippett*, at pp. 1532–1533.) The court stated: "If the contractor and the public agency agree in their contract that employees of contractors will be paid the prevailing wage, as is usually the case, a breach of contract action based on third party beneficiary principles is available to the employee. We find it fairly self-evident that the prevailing wage law was enacted to benefit employees as a class by requiring the payment of prevailing wages on public works. [Citations.] Since employees working on the public works projects are the intended beneficiaries of this provision, they are third party beneficiaries of the contract between the public agency and the contractor. We therefore find no obstacle to the employee's common-law suit against the contractor on a third party beneficiary theory. [Citation.]" (*Id.* at p. 1533.) We cited this passage with approval in *Fidelity Roof, supra,* 60 Cal.App.4th at pages 425–426, and we too concluded that aggrieved employees are third party beneficiaries of a public works contract in which the employer has agreed to pay prevailing wages (*id.* at p. 426).[15]

 The same reasoning persuades us that plaintiffs are third party beneficiaries of the contract in which Cintas agreed to comply with the LWO. Like the prevailing wage law, the LWO is clearly intended to benefit employees by requiring the payment of higher wages. (See Hayward Ord. No. 99-03, § 1(c), (e) [finding the payment of a living wage is necessary to allow employees "to afford a decent standard of living in Hayward"].) Because employees who work on City contracts are intended third party beneficiaries of the provision requiring compliance with the LWO, these employees may sue for their employer's breach of contract in failing to pay a living wage. (Cf. *Fidelity Roof, supra,* 60 Cal.App.4th at p. 426; *Tippett v. Terich, supra,* 37 Cal.App.4th at p. 1533.)

IV. *California Labor Code Violations*

In addition to alleging violations of the LWO itself, plaintiffs sought to recover penalties for various Labor Code violations. Specifically, plaintiffs alleged Cintas violated Labor Code sections 201, 202 and 204[16] by failing to

---

[15] Cintas misconstrues our holding in *Fidelity Roof.* Our discussion of employees' contractual rights was not premised on the absence of a private right of action for employees to enforce the prevailing wage law. (*Fidelity Roof, supra,* 60 Cal.App.4th at pp. 425–426.) As another court has pointed out, these are two separate inquiries: "[T]he right to recover prevailing wages under the statutory scheme is separate from the right to recover under the public works contract. At the risk of stating the obvious, the right to recover under the statute arises from the statutory scheme [citations], while the right to recover on a contract theory arises from the common law right to sue for breach of the express terms of the contract as a third party beneficiary of the public works contract. [Citations.]" (*Road Sprinkler Fitters Local Union No. 669 v. G & G Fire Sprinklers, Inc.* (2002) 102 Cal.App.4th 765, 774 [125 Cal.Rptr.2d 804], fn. omitted (*Road Sprinkler Fitters*).)

[16] Unless otherwise specified, all further statutory references are to the Labor Code.

pay class members full wages and benefits due upon termination, violated section 223 by secretly paying a lower wage than required, violated section 226, subdivision (a) by failing to provide itemized wage statements, and violated section 227.3 by failing to provide paid vacation time upon termination. All of these alleged violations of the Labor Code arose out of Cintas's failure to compensate plaintiff class members in accordance with the LWO.

When proven, Labor Code violations give rise to civil penalties. Some statutory penalties are imposed only if an employers' violation was "willful" or "knowing." Relevant to the claims here, section 203 penalizes an employer that "willfully" fails to pay wages due under sections 201 or 202, and section 226, subdivision (e) penalizes an employer's "knowing and intentional" failure to provide itemized wage statements under section 226, subdivision (a) (see also § 226.3 [providing civil penalties for violation of § 226, subd. (a) but directing Labor Commissioner to consider whether violation was inadvertent]). Two other penalty statutes impose penalties regardless of the employer's mental state but provide for higher penalties if the violation is "willful or intentional." (Former §§ 210, as amended by Stats. 1983, ch. 1096, § 1, p. 4103 [penalties for violation of § 204], 225.5, as amended by Stats. 1983, ch. 1096, § 2, p. 4103 [penalties for violation of § 223].) Plaintiffs argued they were entitled to the maximum penalties under these statutes, however the trial court disagreed. Because the court concluded Cintas's conduct was not "willful," it declined to impose or increase penalties under all provisions that include a "willfulness" component. In their cross-appeal from the judgment, plaintiffs challenge the court's finding on willfulness. They also complain the court underassessed applicable penalties, even assuming the finding on willfulness was correct.

Plaintiffs' right to pursue most of these Labor Code penalties came about with the passage of the Private Attorneys General Act (PAGA). (§ 2698 et seq.) Their original complaint, filed on June 23, 2003, sought waiting time penalties under section 203 but no other Labor Code penalties. However, on September 16, 2004, plaintiffs filed a second amended complaint to seek additional penalties under PAGA, which went into effect on January 1, 2004. In addition to establishing new civil penalties for Labor Code violations that did not previously carry a penalty (§ 2699, subd. (f)), PAGA allows aggrieved employees to recover Labor Code penalties directly from their employers. (§ 2699, subd. (g).) Previously, only the Labor Commissioner was authorized to pursue such remedies. (See, e.g., former §§ 210, subd. (b), 225.5, subd. (b) [stating penalty is to be recovered by the Labor Commissioner].) If an employee successfully recovers an award of civil penalties, PAGA requires that 75 percent of the recovery be paid to the Labor and Workforce Development Agency, with the remaining 25 percent going to the employee. (§ 2699, subd. (i).) Because PAGA did not become effective until after plaintiffs filed their lawsuit, Cintas argued its provisions could not be applied

retroactively. The trial court rejected this argument, however, and ruled that plaintiffs could rely on PAGA to seek the Labor Code penalties described above. Cintas challenges this ruling on appeal and disputes the court's calculation of several separate penalties.

We address first whether plaintiffs were entitled to rely on PAGA to penalize conduct that occurred before the statute went into effect. We next address the court's threshold finding that Cintas's conduct was not "willful" for purposes of the penalty provisions. Finally, we consider each side's arguments pertaining to the calculation of penalties.

## A. *Application of PAGA to Preenactment Conduct*

### 1. *Retroactivity*

Before the enactment of PAGA, divisions of the Labor and Workforce Development Agency—in particular, the Labor Commissioner—had the sole statutory authority to assess and collect civil penalties for many Labor Code violations. However, in 2003 the Legislature determined that shortages in funding and staffing in these agencies were preventing vigorous pursuit of civil penalties and thus hampering their intended deterrent effect.[17] (Stats. 2003, ch. 906, § 1; *Caliber Bodyworks, Inc. v. Superior Court* (2005) 134 Cal.App.4th 365, 374 [36 Cal.Rptr.3d 31].) As a result, the Legislature found it was in the public interest to expand the authority to pursue such penalties to "aggrieved employees acting as private attorneys general" in instances when the state's labor enforcement agencies had not acted. (Stats. 2003, ch. 906, § 1, subd. (d).)

Plaintiffs amended their complaint to seek penalties under the newly enacted PAGA for Cintas's violations of various Labor Code provisions. Thus, the question arises whether PAGA may be applied in pending cases such as the present one, or whether doing so would have an impermissible retroactive effect. The trial court ruled that the expanded standing granted to private parties under PAGA could be applied immediately; however, the court determined that plaintiffs were precluded from pursuing any new penalties created by PAGA for claims that accrued before the statute went into effect.[18]

---

[17] At Cintas's request, we take judicial notice of legislative history materials surrounding the enactment of Senate Bill No. 796 (2003–2004 Reg. Sess.) and its later amendments.

[18] Specifically, the court observed section 227.3 (requiring payment of vested vacation wages upon termination) carried no civil penalty before the passage of PAGA. Because the penalty for this violation was new, the court concluded its application with respect to class members terminated before PAGA went into effect would impermissibly increase Cintas's liability for past conduct. Violations occurring after PAGA's effective date did not pose a retroactivity problem, however. Therefore, the section 227.3 penalty claims of class members who were terminated after January 1, 2004, remained viable. Neither side appears to contest this aspect of the court's ruling (i.e., with respect to penalties available under § 227.3).

Cintas now complains this ruling was an impermissible retroactive application of PAGA. We disagree.

■ "New statutes are presumed to operate only prospectively absent some clear indication that the Legislature intended otherwise. [Citations.]" (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 936 [22 Cal.Rptr.3d 530, 102 P.3d 915].) However, before this presumption applies, we must consider "what the terms 'prospective' and 'retrospective' mean." (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 288 [279 Cal.Rptr. 592, 807 P.2d 434].) "In deciding whether the application of a law is prospective or retroactive, we look to function, not form. [Citations.] We consider the effect of a law on a party's rights and liabilities, not whether a procedural or substantive label best applies. Does the law 'change[] the legal consequences of past conduct by imposing new or different liabilities based upon such conduct[?]' [Citation.] Does it 'substantially affect[] existing rights and obligations[?]' [Citation.] If so, then application to a trial of preenactment conduct is forbidden, absent an express legislative intent to permit such retroactive application. If not, then application to a trial of preenactment conduct is permitted, because the application is prospective." (*Elsner v. Uveges, supra*, 34 Cal.4th at pp. 936–937.)

■ "[A] retroactive or retrospective law ' "is one which affects rights, obligations, acts, transactions and conditions which are performed or exist prior to the adoption of the statute." ' (*Aetna Cas. & Surety Co. v. Ind. Acc. Com.* (1947) 30 Cal.2d 388, 391 [182 P.2d 159]; accord, *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1206 [246 Cal.Rptr. 629, 753 P.2d 585].)" (*Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 839 [123 Cal.Rptr.2d 40, 50 P.3d 751].) Under the United States Supreme Court's definition, it is a law that " 'takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past . . . .' [Citation.]" (*Landgraf v. USI Film Products* (1994) 511 U.S. 244, 269 [128 L.Ed.2d 229, 114 S.Ct. 1483].)

The enactment of PAGA expanded the universe of parties who can collect penalties from employers for Labor Code violations. In this case, the only effect of the new statute was to allow private parties—class members who are present or former employees of Cintas—to recover penalties that previously could have been recovered only by the state Labor Commissioner. This change did not increase Cintas's liability in any way, because the Labor Commissioner could have recovered the *same* penalties for Cintas's violations before the passage of PAGA.[19] It does not matter that Cintas's wrongful conduct occurred before PAGA was enacted because the legal consequences

---

[19] Although PAGA also increased the penalties available for some violations, plaintiffs did not seek these higher rates.

of this conduct remained the same. "A statute is retroactive if it substantially changes the legal effect of past events. [Citations.] A statute does not operate retroactively merely because some of the facts or conditions upon which its application depends came into existence prior to its enactment. [Citations.]" (*Kizer v. Hanna* (1989) 48 Cal.3d 1, 7–8 [255 Cal.Rptr. 412, 767 P.2d 679].) Nor does it matter that Cintas may have expected to be held accountable for penalties to the Labor Commissioner instead of to plaintiff class members. "A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment [citation] or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." (*Landgraf v. USI Film Products, supra,* 511 U.S. at pp. 269–270, fn. omitted.) Because PAGA did not increase Cintas's liability for Labor Code penalties, its application in this case was not retroactive. (See *Myers v. Philip Morris Companies, Inc., supra,* 28 Cal.4th at p. 839 [defining a retroactive statute as one that operates to increase a party's liability for past conduct].)

In addition, although neither party discussed the case in its briefing, we find support for our conclusion in the Supreme Court's analysis in *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223 [46 Cal.Rptr.3d 57, 138 P.3d 207] (*Mervyn's*). *Mervyn's* concerned the effect of Proposition 64, which amended the standing provisions of the unfair competition law. (Bus. & Prof. Code, §§ 17203, 17204.) Previously, any member of the general public could sue for relief from unfair competition; however, Proposition 64 changed the law to limit standing to only those private parties who suffered injury as a result of the unfair competition. (*Mervyn's, supra,* 39 Cal.4th at p. 227.) In *Mervyn's*, the Supreme Court concluded these amended standing provisions could be applied to cases pending when Proposition 64 took effect. (*Mervyn's,* at p. 227.) The court contrasted statutes it had found to be retroactive—because they imposed broader duties, expanded liability or increased punishment—with statutes courts have found to be prospective and thus permissible. (*Id.* at p. 231.) In each of the cases finding a statute to be prospective, the court observed, "application of the new law to pending cases properly *governed the conduct of proceedings* following the law's enactment without changing the legal consequences of past conduct. [Citation.]" (*Id.* at pp. 231–232; see *In re Vaccine Cases* (2005) 134 Cal.App.4th 438, 454–456 [36 Cal.Rptr.3d 80] [imposing certificate of merit requirement]; *Brenton v. Metabolife Internat., Inc.* (2004) 116 Cal.App.4th 679, 688–691 [10 Cal.Rptr.3d 702] [eliminating ability to bring anti-SLAPP (strategic lawsuit against public participation) motion to dismiss for certain suits]; *Landau v. Superior Court* (1998) 81 Cal.App.4th 191, 213–216 [97 Cal.Rptr.2d 657] [eliminating right to appeal in favor of review by writ of mandate].) Thus, the *Mervyn's* court concluded: "To apply Proposition 64's standing provisions to

the case before us is not to apply them 'retroactively,' as we have defined that term, because the measure does not change the legal consequences of past conduct by imposing new or different liabilities based on such conduct. [Citation.] The measure left entirely unchanged the substantive rules governing business and competitive conduct. Nothing a business might lawfully do before Proposition 64 is unlawful now, and nothing earlier forbidden is now permitted. Nor does the measure eliminate any right to recover." (*Mervyn's, supra*, 39 Cal.4th at p. 232, fn. omitted.)

Our case is the procedural opposite of *Mervyn's*, because PAGA granted private parties standing whereas Proposition 64 took their standing away absent a showing of injury. But the high court's analysis of retroactivity is directly on point. Like Proposition 64, PAGA did not impose new or different liabilities on defendants based on their past conduct. (See *Mervyn's, supra*, 39 Cal.4th at p. 232.) It merely changed the procedural rules governing *who* has authority to sue for certain penalties. Like the amendments to standing addressed in *Mervyn's*, PAGA's extension of standing to private parties is prospective in nature. Accordingly, it was properly applied to the claims pending in this lawsuit.

Having concluded the statute is not retroactive in effect, we need not address the parties' attempts to divine legislative intent about the application of PAGA to past conduct.

### 2. *PAGA Claims Relate Back to Original Complaint*

In a related argument, Cintas contends the trial court erred in concluding plaintiffs' claim for PAGA-based penalties relates back to their original complaint. This conclusion was important for the calculation of penalties, since the trial court determined that PAGA penalties are subject to a one-year statute of limitations. (Code Civ. Proc., § 340.)

■■■ "The prevailing rule with respect to actions involving parties designated by their true names in the original complaint is that, if an amendment is sought after the statute of limitations has run, the amended complaint will be deemed filed as of the date of the original complaint provided recovery is sought in both pleadings on the same general set of facts. (*Austin* v. *Massachusetts Bonding & Insurance Co.* (1961) 56 Cal.2d 596, 600 [15 Cal.Rptr. 817, 364 P.2d 681].)" (*Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575, 583 [86 Cal.Rptr. 465, 468 P.2d 825].) Cases applying this relation back rule have made it clear that "it is the sameness of the facts rather than the rights or obligations arising from those facts that is determinative. [Citation.]" (*Lamont v. Wolfe* (1983) 142 Cal.App.3d 375, 378 [190 Cal.Rptr. 874].) Thus, amendments alleging a new theory of liability against the defendant have

been found to relate back to the original complaint, so long as the new cause of action is based on the same set facts previously alleged. (See *Grudt v. City of Los Angeles, supra,* 2 Cal.3d at pp. 583–584 [amended complaint adding claim of negligence based on respondeat superior related back to original filing because it was based on the same alleged misconduct by police officers]; *Lamont v. Wolfe, supra,* 142 Cal.App.3d at pp. 378–380 [husband's amended complaint for wrongful death related back to original complaint for loss of consortium because both claims were based on the same negligent acts of the defendants and the same injuries to the husband].) Likewise, an amendment seeking new damages relates back to the original complaint if such damages resulted from the same operative facts—i.e., the same misconduct and the same injury—previously complained of. (*Walton v. Guinn* (1986) 187 Cal.App.3d 1354, 1362 [232 Cal.Rptr. 451] [amendment adding new allegation of special damages related back because these damages resulted from the same injury and same accident alleged in original complaint].)

Plaintiffs' request for PAGA penalties in the second amended complaint was based on the exact same facts alleged in their original complaint regarding Cintas's failure to comply with the LWO. The factual basis of Cintas's liability is the same, and the resulting injury plaintiffs allege is the same. It is true that plaintiffs could not have included a claim for PAGA penalties in their original complaint, because it was filed before PAGA was enacted, but this fact does not change the analysis. As the trial court observed, PAGA was at most a new theory of recovery that became available to plaintiffs during the pendency of their lawsuit, and claims based on new legal theories may relate back so long as they address the same set of facts. (*Grudt v. City of Los Angeles, supra,* 2 Cal.3d at pp. 583–584; see also *Lamont v. Wolfe, supra,* 142 Cal.App.3d at pp. 381–382 [even though wrongful death claim could not have existed when original complaint was filed, because decedent was alive, relation back doctrine applied because plaintiff was seeking recovery for what was essentially the same loss].)

Cintas does not directly dispute these conclusions. Rather, Cintas suggests it was improper for the court to allow plaintiffs to recover any PAGA penalties if the statute of limitations would have barred the Labor Commissioner from pursuing such claims when plaintiffs filed their second amended complaint on September 16, 2004. This argument is a red herring. Assuming it is appropriate to compare plaintiffs' claims with claims the Labor Commissioner could have filed, the proper question would be whether the commissioner could have added penalties in September 2004 to an action initiated in June 2003. In light of the relation-back precedents we have discussed, the commissioner could indeed have added such penalty claims, so long as they concerned the same underlying conduct previously complained of, and the claims would not be time-barred.

### B. *Willfulness of Violations*

We turn next to plaintiffs' argument in the cross-appeal that Cintas's Labor Code violations were willful, such that plaintiffs were entitled to recover "waiting time" penalties under section 203 and other penalties.

The settled meaning of "willful," as used in section 203, is that an employer has intentionally failed or refused to perform an act which was required to be done. (*Barnhill v. Robert Saunders & Co.* (1981) 125 Cal.App.3d 1, 7–8 [177 Cal.Rptr. 803] (*Barnhill*); *Davis v. Morris* (1940) 37 Cal.App.2d 269, 274 [99 P.2d 345].) "[T]he employer's refusal to pay need not be based on a deliberate evil purpose to defraud workmen of wages which the employer knows to be due." (*Barnhill, supra*, 125 Cal.App.3d at p. 7; see *Davis v. Morris, supra*, 37 Cal.App.2d at p. 274.)

In *Barnhill*, this court considered whether an employer's failure to pay wages is "willful" if its legal duty to pay them is unclear at the time of the violation. When the employee in *Barnhill* was discharged, she owed her employer a balance on a promissory note, which was intended to be repaid in installments by payroll deductions. (*Barnhill, supra*, 125 Cal.App.3d at p. 4.) The employer set off the balance due on the promissory note against the final wages paid to the employee, and the employee sued to recover her full wages plus waiting time penalties under section 203. (125 Cal.App.3d at p. 4.) The trial court awarded both wages and penalties, but we reversed the penalty award. Although ultimately determining the setoff was not permissible, we noted that the state of the law was not clear at the time the employer withheld wages, and several California appellate decisions approved of such setoffs. (*Id.* at pp. 5, 8–9.) "[G]iven that uncertainty," we reasoned, "appellant should not be penalized for believing that setoff was proper and payment of wages not required." (*Id.* at p. 8.) Accordingly, the employer's nonpayment of wages was not willful for purposes of section 203. (125 Cal.App.3d at pp. 8–9.)

*Barnhill*'s holding was memorialized in California Code of Regulations, title 8, section 13520. This regulation states: "A willful failure to pay wages within the meaning of Labor Code Section 203 occurs when an employer intentionally fails to pay wages to an employee when those wages are due. However, a good faith dispute that any wages are due will preclude imposition of waiting time penalties under Section 203. [¶] (a) Good Faith Dispute. A 'good faith dispute' that any wages are due occurs when an employer presents a defense, based in law or fact which, if successful, would preclude any recover on the part of the employee. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist. Defenses presented which, under all the circumstances, are unsupported by any evidence, are unreasonable, or are presented in bad faith, will preclude a finding of a 'good faith dispute.' " (Cal. Code Regs., tit. 8, § 13520.)

Even more so than in *Barnhill*, the legal obligations imposed on employers by the LWO were unclear at the time of Cintas's violations. As Cintas's vigorous defense of this class action has made clear, numerous arguments exist concerning the constitutionality of the LWO and its proper interpretation. Before the trial court rulings in this case, no court had previously addressed the scope or the validity of the City's LWO. Living wage ordinances such as the one at issue here are a relatively recent phenomenon. Indeed, until now, it appears no California appellate decision has construed the requirements of *any* municipality's living wage ordinance, or addressed the constitutional challenges to any such ordinance that Cintas has raised.[20] Although we have rejected Cintas's legal arguments about the LWO, these defenses were not unreasonable or frivolous. On the contrary, they raised complicated issues of first impression (as plaintiffs themselves recognize in their arguments supporting the trial court's use of a substantial multiplier in awarding attorney fees).

Plaintiffs argue the lack of case law setting forth an employer's obligations is not dispositive on the issue of willfulness, relying on *Armenta v. Osmose, Inc.* (2005) 135 Cal.App.4th 314 [37 Cal.Rptr.3d 460] (*Armenta*). However, although the court in *Armenta* observed that California law was unsettled, the presumption of good faith this legal uncertainty might have given the employer was outweighed by evidence that the employer was *in fact* aware that its employees were not being fully compensated for their time. (*Id.* at pp. 325–326.) Applying substantial evidence review, the court simply upheld the trial court's finding of willfulness. (*Id.* at pp. 326–327.) The same substantial evidence analysis led to an affirmance of section 203 penalties in another case relied on by plaintiffs, *Road Sprinkler Fitters, supra,* 102 Cal.App.4th 765. The *Road Sprinkler Fitters* court distinguished *Barnhill* because the employer's legal obligation was clear and substantial evidence supported the lower court's finding that the employer had acted in bad faith. (*Road Sprinkler Fitters, supra,* 102 Cal.App.4th at pp. 781–783.) Thus, any legal mistake the employer claimed to have made was not reasonable and not made in good faith. (*Id.* at pp. 782–783.)

*Armenta* and *Road Sprinkler Fitters* do not support plaintiffs' position. Here, there is no evidence showing Cintas ever knew it was required to compensate its production workers at the rates prescribed in the LWO, or showing the company acted in bad faith when it failed to pay such rates. On the contrary, the trial court expressly distinguished *Road Sprinkler Fitters*

---

[20] In *RUI One Corp. v. City of Berkeley* (9th Cir. 2004) 371 F.3d 1137, the Ninth Circuit Court of Appeals upheld a living wage ordinance adopted by the City of Berkeley against claims that it violated due process and equal protection under the state and federal Constitution and violated the contract clause of the United States Constitution. None of the issues raised in *RUI One Corporation* are germane to this case, and, in any event, the Ninth Circuit's decision was issued almost a year after Cintas terminated its contracts with the City.

when it found the City had not directly informed Cintas that its production workers were covered by the LWO, or that LWO rates were required for all hours these employees worked and not just for hours worked on the City's contract. Although the issue of willfulness in this case strikes us as primarily legal in nature, insofar as it turns on the reasonableness of Cintas's legal defenses, to the extent it concerns factual matters we must accept the trial court's findings if they are supported by any substantial evidence in the record. (*Road Sprinkler Fitters, supra*, 102 Cal.App.4th at p. 781.) The trial court acknowledged that Cintas's "cavalier approach to fulfilling its contractual and statutory obligations" could be characterized as an indication of gross negligence or recklessness; however, the court found "[t]here is no evidence that [Cintas] does not entertain a 'good faith belief' that the LWO did not apply to workers in Plaintiffs' position."[21]

Plaintiffs have directed us to no evidence that contradicts this finding of good faith. Instead, they complain the trial court focused on the wrong timeframe. Rather than asking whether an employer currently offers a good faith defense to the payment of wages, plaintiffs insist nonpayment of wages must be considered willful unless the employer relies upon a good faith defense *at the time the wages are due*. Because evidence from Cintas's general managers indicates the company did not pay attention to the LWO's requirements, or attempt to comply with them, plaintiffs argue Cintas cannot have relied on its current legal defenses when it failed to pay class members LWO wages during the contract period. However, despite plaintiffs' creative interpretations of language in certain cases and the applicable regulation, there is no legal support for the requirement plaintiffs would impose. Nothing in California Code of Regulations, title 8, section 13520 requires that a "good faith dispute" must exist at the time wages are due. On the contrary, the regulation simply states that a good faith dispute "occurs when an employer presents a defense, based in law or fact which, if successful, would preclude any recover on the part of the employee." (Cal. Code Regs., tit. 8, § 13520, subd. (a).) Compared with the broader word "dispute," also used in the regulation, a "defense" is something typically asserted in the context of litigation. In contrast with the general notion of a dispute, a defense in

---

[21] Plaintiffs rely on cases from other contexts to argue that gross negligence or recklessness may constitute willfulness. (See, e.g., *Safeco Ins. Co. of America v. Burr* (2007) 551 U.S. 47, 56–59 [167 L.Ed.2d 1045, 127 S.Ct. 2201, 2208–2210] [construing willfulness requirement in the federal Fair Credit Reporting Act].) However, " 'Wilful' is a term of art carrying with it certain requisites as to the amount and type of proof which will suffice to find a violation of the particular statute in reference. . . . [T]he term has different connotations and implications depending upon the nature, purpose and intent of the statute . . . ." (*Triad Data Services, Inc. v. Jackson* (1984) 153 Cal.App.3d Supp. 1, 10 [200 Cal.Rptr. 418], disapproved on another ground in *Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 370 [127 Cal.Rptr.2d 516, 58 P.3d 367].) Because "willful" is defined for our purposes in California Code of Regulations, title 8, section 13520, we see no reason to borrow definitions pertaining to other statutes.

litigation is "presented"; it may be "based in law or fact"; it may be supported or "unsupported by . . . evidence"; it may be "successful" or "ultimately unsuccessful." (Cal. Code Regs., tit. 8, § 13520.) All of these descriptions of the type of "defense" that precludes imposition of waiting time penalties indicate the regulation is referring to a litigation defense. Precisely when the employer formulated such a defense is, it seems to us, beside the point. So long as no other evidence suggests the employer acted in bad faith, presentation of a good faith defense, based in law or fact, will negate a finding of willfulness.

This court's decision in *Barnhill* did not hold otherwise. *Barnhill* includes no factual finding or discussion regarding when the employer believed it had a legal right to set off the balance of a promissory note against her wages. We noted that the state of the law was unclear when the trial court determined the employer had no right to make such a setoff, but we did not attempt to divine the employer's subjective belief about the law or when this belief was formulated. (*Barnhill, supra,* 125 Cal.App.3d at p. 8.)

## C. *Amount of Labor Code Penalties*

Cintas raises two types of challenges in regard to the amount of penalties awarded. First, Cintas argues it is not liable for penalties that were imposed pursuant to specific penalty provisions. Next, Cintas claims the trial court abused its discretion in awarding full penalties under PAGA because it failed to follow the guidelines of the Department of Labor Standards and Enforcement (DLSE) and set the penalties in an unjust, arbitrary and oppressive amount. We examine whether penalties could be imposed against Cintas under the specific statutes and then consider whether the trial court abused its discretion in declining to reduce the penalty award.

### 1. *Challenges to Specific Penalties*

#### a. *Section 223: Secret Underpayments*

Cintas claims the trial court erred in awarding penalties for a violation of section 223, which provides: "Where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract." The evidence below showed that although Cintas was on notice of its obligations under the LWO and certified to the City its intention to comply with the LWO, Cintas failed to pay class members at the LWO rate. The trial court concluded these facts established a violation of section 223.

On appeal, Cintas claims the trial court misinterpreted section 223. According to Cintas, this statute only applies when an employer has kept secret *from*

*its employee* that it is paying a lower wage than is required by statute or contract. However, the language of section 223 does not impose this limitation, and Cintas cites no case law interpreting section 223 in this manner.

Cintas correctly observes that section 223 was enacted to address the problem of employers taking secret deductions or "kickbacks" from their employees. (*Kerr's Catering Service v. Department of Industrial Relations* (1962) 57 Cal.2d 319, 328–329 [19 Cal.Rptr. 492, 369 P.2d 20]; *Steinhebel v. Los Angeles Times Communications, LLC* (2005) 126 Cal.App.4th 696, 707 [24 Cal.Rptr.3d 351].) In such cases, the employer nominally pays employees the wage required by a statute or collective bargaining agreement but then secretly deducts amounts or requires employees to pay back a portion of the wages, so that in reality the employees are earning less than was required. (See, e.g., *Sublett v. Henry's etc. Lunch* (1942) 21 Cal.2d 273, 274 [131 P.2d 369] [describing "kickback" scheme to defeat payment of union wages]; *Shalz v. Union School Dist.* (1943) 58 Cal.App.2d 599, 601–602, 605 [137 P.2d 762] [finding violation of § 223 by contractor that agreed to pay prevailing wages but took large deductions, ostensibly for employees' lodging]; see also *Steinhebel v. Los Angeles Times Communications, LLC, supra*, 126 Cal.App.4th at pp. 706–708 [concluding a charge back on advances of future commissions does not violate § 223 where employee has received the full statutory minimum wage].) However, in all of these cases the underpayment of wages is a secret being kept *from applicable enforcement authorities*—i.e., the Labor Commissioner, the employee's union (*Sublett v. Henry's etc. Lunch, supra*, 21 Cal.2d at p. 274), or a contracting party (*Shalz v. Union School Dist., supra*, 58 Cal.App.2d at pp. 601–602)—not from the employees themselves, who presumably are well aware of how much they are paid.

Moreover, Cintas's construction is inconsistent with the plain language of the statute. Section 223 deems it unlawful "to secretly pay a lower wage while purporting to pay" the higher wage required by law or contract. Accordingly, the statute punishes secret underpayment. Under Cintas's interpretation, it could only have violated section 223 if it kept secret from its employees *that they were entitled to be paid a higher wage than they received*. But, in such case, the secret is not the making of an "underpayment" but rather the existence of the employer's obligation to pay more. If the Legislature wished to penalize employers for failing to advise employees of their right to receive a higher wage, one would expect it to say so directly.

Cintas does not dispute the factual basis of the trial court's ruling. Cintas represented to the City that it would pay its employees in accordance with the LWO, and it certified its compliance with the ordinance even though it was in fact paying its production workers lower wages. These facts are sufficient to establish a violation of section 223. (See *Shalz v. Union School Dist., supra*, 58 Cal.App.2d at p. 605.)

### b. *Section 227.3: Vacation Pay*

Next, Cintas contends the trial court erred in awarding PAGA penalties of $500 for a violation of section 227.3.[22] Section 227.3 states, in relevant part: "Unless otherwise provided by a collective-bargaining agreement, whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate in accordance with such contract of employment or employer policy respecting eligibility or time served; provided, however, that an employment contract or employer policy shall not provide for forfeiture of vested vacation time upon termination."

Cintas argues penalties are not appropriate here because section 227.3 requires an employer to compensate employees for their accrued vacation time in accordance with "a contract of employment or employer policy," and the LWO is neither of these things. Plaintiffs counter that the LWO's provisions were "effectively incorporated" into their employment contracts. The trial court reached a similar conclusion, noting the LWO entitled plaintiffs to additional vacation time and thus, as to those class members who were terminated and not paid for this time, section 227.3 was violated.

Without regard to whether the LWO was somehow incorporated into plaintiffs' employment contracts, we agree with plaintiffs' observation that "the LWO . . . applies of its own force as a governing legal entitlement and therefore allows plaintiff class members to recover their accrued vacation pay." However, the question here is not whether plaintiffs may recover their accrued vacation pay but whether Cintas may be subjected to Labor Code penalties. The answer turns upon whether Cintas violated section 227.3 when it failed to pay terminated plaintiffs for the additional vacation time they accrued pursuant to the LWO. We think it did.

 Section 227.3 merely provides that if an employer promises—by contract or policy—to give its employees paid vacations, the employer must pay an employee wages for all "vested vacation time" he has accrued but not taken at the time of his termination. The statute does not specify the manner in which the employee must have accrued this time. We do not read it to say,

---

[22] Although section 227.3 itself does not provide for penalties, plaintiffs sought to recover them under the provision of PAGA that makes penalties available where they are not otherwise provided. (§ 2699, subd. (f).) Because the penalty did not exist before the enactment of PAGA, its imposition would have been impermissibly retroactive if based on violations of section 227.3 that occurred before January 1, 2004. (See *Myers v. Philip Morris Companies, Inc., supra,* 28 Cal.4th at p. 839.) However, the trial court avoided a retroactivity problem by calculating penalties based on the number of class members who were terminated after that date.

as Cintas suggests, that an employer must only pay wages for vacation time that was accrued "in accordance with" or "as a result of" or "pursuant to" an employment contract or policy. Rather, it states that if the *entitlement* to paid vacation leave *in general* is given to employees in such a contract or policy, the employer must pay the employee wages, in accordance with the contract or policy, for accrued vacation time. (§ 227.3.) Case law also supports this interpretation. It is settled that "[p]aid vacation provided by an employment agreement vests as the employee labors. [Citation.]" (*Boothby v. Atlas Mechanical, Inc.* (1992) 6 Cal.App.4th 1595, 1597 [8 Cal.Rptr.2d 600].) Thus, in reversing a lower court ruling that prevented an employee from recovering for unused vacation time earned over several years, the Third District Court of Appeal held "accumulation of vacation time does not depend on an agreement which expressly *permits* it. Rather, unused vacation accumulates unless the employment agreement legally *prevents* it." (*Id.* at p. 1598.)

Accordingly, because Cintas does not dispute that plaintiffs' employment contracts provided for paid vacations, and does not dispute that it failed to pay terminated class members for vacation time they accrued under the LWO, a violation of section 227.3 was established and the $500 penalty was properly imposed.

c. *Former Sections 210/225.5: "Initial" Violations*

Having found that Cintas violated sections 204 and 223, the trial court assessed penalties under their corresponding penalty statutes, former sections 210 and 225.5 These statutes, which are substantially identical, provide that every person who fails to pay the wages of an employee (pursuant to § 204) or withholds wages due an employee (pursuant to § 223) "shall be subject to a civil penalty as follows: [¶] (a) For any initial violation, [fifty dollars ($50)] for each failure to pay each employee. [¶] (b) For each subsequent violation, or any willful or intentional violation, [one hundred dollars ($100)] for each failure to pay each employee, plus 25 percent of the amount unlawfully withheld." (Former §§ 210, 225.5.)[23]

The parties disagree with each other and with the trial court about the proper interpretation of this language. Plaintiffs contend the provision means a violation occurs every pay period that an employee's wages are underpaid. The first underpayment of wages constitutes an "initial" violation, but,

---

[23] Penalties are set at $100 for initial violations and $200 for subsequent, willful or intentional violations under the current versions of sections 210 and 225.5; however, plaintiffs sought only the penalties at the lower level that applied before these statutes were amended. Accordingly, all references to sections 210 and 225.5 in our discussion are to the former versions of these statutes before they were amended in 2003. (See Stats. 1983, ch. 1096, §§ 1, 2, p. 4106.)

according to plaintiffs, all future pay periods when wages are underpaid must be construed as "subsequent" violations and penalized at the higher rate. Thus, plaintiffs argue that Cintas should be penalized $50 for the first pay period a class member was underpaid, plus $100 for every subsequent pay period in which the class member continued to be underpaid. Cintas's interpretation is quite the reverse. Cintas disagrees with the idea that a violation carrying penalties occurs every pay period, citing examples of other statutes that expressly impose penalties "per pay period." (E.g., § 2699, subd. (f)(2).) Cintas also argues an employer cannot be penalized at the higher rate for subsequent violations unless it has received some notice that its previous underpayment was a "violation" of the law. Thus, under Cintas's view, former sections 210 and 225.5 require penalties of $50 per class member for the company's initial violations of sections 204 and 223, and nothing more.

The trial court adopted neither party's position in its entirety. Instead, the court agreed with the interpretation used by the DLSE, as set forth in a February 22, 1984 memorandum. Before PAGA was enacted, the Labor Commissioner had sole authority to enforce former sections 210 and 225.5. In the 1984 memorandum to implement these statutes, of which we take judicial notice, the commissioner advised his staff that an "initial" violation is "[a]ny violation occurring on or after January 1, 1984, regardless of whether penalties were assessed," whereas a "subsequent" violation is "[a]ny violation which occurs after notice of a previous violation, regardless of whether penalties were assessed." In describing how an investigating deputy should calculate penalties, the memorandum states: "If the violation is an initial violation, the citing officer will assess a penalty of $50 per each employee per each pay period. [¶] If the violation is a subsequent violation, the citing officer will assess a penalty of $100 per each employee per each pay period."

The parties cite competing case law, as it suits their purposes, for the deference to be accorded to the DLSE memorandum. The most thorough guidance, however, may be found by the Supreme Court's explanation in *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8 [78 Cal.Rptr.2d 1, 960 P.2d 1031] that an agency's interpretation of a statute "is entitled to consideration and respect by the courts" but is not binding, since statutory interpretation is ultimately the responsibility of the judicial branch. (See also *Murphy v. Kenneth Cole Productions, Inc., supra,* 40 Cal.4th at p. 1105, fn. 7 [DLSE's construction of a statute must be considered and respected but is not binding on the court].) "Courts must, in short, independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning, of course, whether embodied in a formal rule or less formal representation." (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at p. 7.)

Upon consideration of the statutory language, we agree with the interpretation the DLSE has used to enforce former sections 210 and 225.5. The statutes state that a penalty for an initial violation is to be imposed "for each failure to pay each employee." (Former §§ 210, subd. (a), 225.5, subd. (a).) This language conveys two things. First, by specifying a $50 penalty must be imposed "for *each* failure to pay each employee" (italics added), the language contemplates that an "initial violation" can result in more than one penalty at the $50 level. In other words, multiple $50 penalties can result from a single initial violation. The only way this could conceivably occur is if penalties are assessed at each pay period. The DLSE's interpretation on this point is consistent with the statutory language: Each time an employer fails to pay its employee in accordance with the specified Labor Code provision, a penalty will result. Second, because the statutory language contemplates the imposition of repeated penalties for each pay period that an initial violation continues, a "subsequent" violation (which carries a double penalty) must refer to something other than an underpayment that occurs after the first pay period. Although common sense might suggest a "subsequent" violation is nothing more than a violation that occurs at a later point in time after an "initial" violation, this definition is inadequate because the statutes provide for multiple penalties for "each failure to pay each employee" incurred in an initial violation. (Former §§ 210, subd. (a), 225.5, subd. (a).) If the difference is not merely temporal, how is one to tell what constitutes a subsequent as opposed to an initial violation? The statutes do not explain, but we find the DLSE's reliance on notice persuasive. Until the employer has been notified that it is violating a Labor Code provision (whether or not the commissioner or court chooses to impose penalties), the employer cannot be presumed to be aware that its continuing underpayment of employees is a "violation" subject to penalties. However, after the employer has learned its conduct violates the Labor Code, the employer is on notice that any future violations will be punished just the same as violations that are willful or intentional—i.e., they will be punished at twice the rate of penalties that could have been imposed or that were imposed for the initial violation.

Accordingly, we conclude the trial court properly assessed penalties against Cintas under former sections 210 and 225.5 at the rate of $50 per pay period per class member.

### 2. *Trial Court's Exercise of Discretion for PAGA Penalties*

#### a. *Standards Guiding Discretion*

Former sections 210 and 225.5 state that "every person who" fails to pay wages (former § 210) or unlawfully withholds wages due (former § 225.5) "shall be subject to a civil penalty" as described in the statute. The

parties disagree about whether the trial court was required to impose penalties under former sections 210 and 225.5, or whether it had discretion to forgo imposing any penalties because Cintas had a good faith dispute about whether wages were due.

Focusing on the word "shall," plaintiffs argue the statutes describe mandatory penalties. (See, e.g., § 15 [as used in the Labor Code, " '[s]hall' is mandatory and 'may' is permissive"].) The repeated use of "shall" later in the statutes supports this view: "The penalty *shall* be recovered by the Labor Commissioner as part of a hearing held to recover unpaid wages and penalties pursuant to this chapter or in an independent civil action. The action *shall* be brought in the name of the people of the State of California and the Labor Commissioner and the attorneys thereof may proceed and act for and on behalf of the people in bringing these actions. All money recovered therein *shall* be paid into the State Treasury to the verdict of the General Fund." (Former §§ 210, 225.5, italics added.)[24] Plaintiffs' interpretation also finds support in legislative history. The Legislative Counsel's Digest of Assembly Bill No. 1682 (1983–1984 Reg. Sess.), which gave rise to the version of the statutes that are at issue in this case, explains that prior law "permit[ted] the Labor Commissioner to recover the [$10] penalty as part of a hearing to recover unpaid wages and penalties or in a . . . civil action." (Legis. Counsel's Dig., Assem. Bill No. 1682 (1983–1984 Reg. Sess.) 4 Stats. 1983, Summary Dig., p. 389.) In addition to increasing the amount of penalties, the Legislative Counsel stated that the bill "*would require, rather than permit,* the Labor Commissioner to recover the penalties." (*Id.* at p. 390, italics added.)

In contrast, Cintas focuses on the words "subject to" in the phrase "shall be subject to a civil penalty," arguing these words indicate the commissioner—or the court, in assessing penalties through PAGA—has discretion to choose *not* to impose any penalty at all. This was the interpretation reached by the Labor Commissioner in the 1984 DLSE memorandum previously discussed. Stressing that violations would only "be subject to" a penalty, the commissioner concluded the amended language permitted the DLSE "to exercise judgment as to whether the penalties should be assessed." The commissioner then expressed guidelines for his staff in exercising such judgment: "Penalties should not be assessed when there is evidence of a good faith dispute, when the wages are paid as the result of a voluntary settlement conference, or if there is other substantial evidence of an absence of intentional violation."

Based on dictionary definitions of the phrase "subject to" and DLSE's interpretation, Cintas argues the trial court had discretion to award *no*

---

[24] Current versions of the statutes provide for a slightly different allocation of the money recovered in penalties, but they continue to use the word "shall" in directing where funds are to be paid.

penalties, if it so chose. Cintas claims the court did not realize it had this discretion, but merely assumed penalties were required, and this lapse constituted an abuse of discretion. (See *Fletcher v. Superior Court* (2002) 100 Cal.App.4th 386, 392 [123 Cal.Rptr.2d 99] [failure to exercise discretion requires reversal].) However, the record does not bear out Cintas's claim. The court considered arguments about the mandatory versus permissive nature of PAGA penalties under former sections 210 and 225.5, and, after summarizing these arguments, its order of January 10, 2006, directed the parties to submit further briefing on the issue. In its next order, on February 3, 2006, the court did not address these arguments directly but simply stated that, considering the facts of the case and the purpose of the penalty provisions, it "[did] not find reason to exercise its discretion to reduce the amount of penalties." Thus, the record does not demonstrate that the trial court believed it was required to award penalties. The court may have believed it had discretion to forgo penalties, but chose to impose them anyway.

 In any event, we think plaintiffs have the better of the argument concerning the mandatory nature of the penalties. This construction is most consistent with the statutory language and the legislative history. The DLSE memorandum's opinion that penalties should not be assessed "when there is evidence of a good faith dispute" has no basis in the statutes, legislative history or case law. Moreover, as the trial court pointed out, this interpretation conflates the standards for a "willful" violation with the statutes' directive that a penalty be imposed for nonwillful initial or subsequent violations. By refusing to assess penalties for any violation that occurred in the context of a good faith dispute, the DLSE's interpretation renders nugatory the statutory directive that an initial, nonwillful violation "shall be subject to a civil penalty." (Former §§ 210, 225.5.) Where an agency's interpretation contradicts or alters the terms of a statute, it is entitled to no deference. (*Traverso v. People ex rel. Dept. of Transportation* (1996) 46 Cal.App.4th 1197, 1206–1207 [54 Cal.Rptr.2d 434].)[25]

This leads us to a related argument advanced by Cintas. Cintas objects to penalties that could be recovered only by the Labor Commissioner before PAGA was enacted. In describing the trial court's discretion to assess penalties made available by PAGA, section 2699, subdivision (e)(1) states: "For purposes of this part, whenever the Labor and Workforce Development

---

[25] Cintas counters that an initial violation "has meaning" even if no penalties are assessed because, after an initial violation, later violations will be considered "subsequent" and penalized at a higher rate. This observation (which is based on analysis set forth elsewhere in the same DLSE memorandum) is beside the point. The statutes direct penalties to be imposed for all violations, but DLSE's enforcement policy excuses penalties when the employer's conduct is not willful.

Agency, or any of its departments, divisions, commissions, boards, agencies, or employees, has discretion to assess a civil penalty, a court is authorized to exercise the same discretion, subject to the same limitations and conditions, to assess a civil penalty." Cintas interprets this provision to mean that a court is *required* to assess penalties in accordance with the same standards that govern the DLSE's exercise of discretion. Specifically, Cintas asserts the trial court was bound to follow the enforcement procedures set forth in the 1984 DLSE memorandum, which prohibit the imposition of penalties "when there is evidence of a good faith dispute." Because the trial court found that there was such a good faith dispute in this case, precluding a finding of willfulness, Cintas argues the court violated the DLSE's policy by awarding penalties. This argument suffers from several flaws.

First, "authorized" does not mean "required." That a court has authority to exercise discretion in the same manner as the DLSE does not necessarily mean it is required to do so. Without further support for this interpretation— and none has been offered—we are disinclined to believe the Legislature intended to so circumscribe the court's discretion. Second, as we have explained, the DLSE's policy of forgiving penalties when the employer has a good faith defense is entitled to no deference because it contradicts the express language of former sections 210 and 225.5. Third, Cintas's argument contravenes Supreme Court authority holding that DLSE internal policies interpreting statutes are not entitled to judicial deference because they were not promulgated in accordance with the Administrative Procedures Act (APA). (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 576 [59 Cal.Rptr.2d 186, 927 P.2d 296] (*Tidewater*); see also *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 581 [94 Cal.Rptr.2d 3, 995 P.2d 139].) In *Tidewater, supra,* 14 Cal.4th at pages 572, 576, the court concluded DLSE policies intended to guide deputy labor commissioners' enforcement of a statute are regulations within the meaning of the APA, and thus the agency is required to follow the APA's rulemaking procedures in adopting them. Informal DLSE enforcement policies are not only void as regulations, but the court stressed that such policies, no matter how long-standing, may be given no weight in a judicial analysis. (*Tidewater*, at p. 576; see also *Morillion v. Royal Packing Co., supra,* 22 Cal.4th at pp. 581–582; *Church v. Jamison* (2006) 143 Cal.App.4th 1568, 1578–1579 [50 Cal.Rptr.3d 166].) Given this Supreme Court authority, which was settled by the time PAGA was enacted, we cannot conclude the Legislature intended trial courts to be constrained to follow DLSE enforcement policies the high court had declared void.

Accordingly, the trial court did not abuse its discretion in awarding PAGA penalties under former sections 210 and 225.5. We now consider Cintas's claims that the court erred in declining to reduce the amount of the penalties.

### b. *Amount of Award*

Section 2699, subdivision (e)(2) provides that in an action by an aggrieved employee to recover PAGA penalties, the court "may award a lesser amount than the maximum civil penalty amount specified by this part if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory." The trial court declined to do so in this case, stating: "Taking into account the facts in this matter, and the purposes of the penalty provisions at issue, the Court does not find reason to exercise its discretion to reduce the amount of penalties." Cintas argues the court committed legal error by considering the purpose of the statutes and abused its discretion by "imposing penalties that are unjust, arbitrary and oppressive and confiscatory" in amount.

No authority brought to our attention supports Cintas's claim of legal error. Cintas argues that a trial court imposing PAGA penalties can exercise its discretion based *only* on the considerations mentioned in section 2699, subdivision (e)(2). This argument rests on a misunderstanding of the nature of PAGA penalties: As we have explained, they are mandatory, not discretionary. Accordingly, section 2699, subdivision (e)(2) describes the conditions under which a trial court may exercise its discretion to *reduce* penalties. It does not specify guidelines for exercising discretion in general with regard to the amount of penalties, because the amount is fixed by statute. Cintas correctly points out that judicial discretion must be exercised within the confines of the statute that grants the discretion (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 393–394 [33 Cal.Rptr.3d 644]), but what this principle means in the context of section 2699, subdivision (e)(2) is that a court can only exercise its discretion *to award lesser penalties* based on the enumerated considerations. The text of section 2699 and the legislative history of PAGA indicate the purpose of the act was to encourage broad collection of civil penalties to deter Labor Code violations. (See *Caliber Bodyworks, Inc. v. Superior Court, supra*, 134 Cal.App.4th at pp. 370, 374.) The trial court was not required to ignore the remedial purpose of the law when it declined to reduce the penalties to be imposed on Cintas.

Nor has Cintas shown the penalty award is unjust, arbitrary and oppressive, or confiscatory. Cintas claims the imposition of $258,900 in penalties is unjust, arbitrary and oppressive because the LWO is ambiguous and it was unclear whether or to what extent it applied to the work plaintiffs performed. However, several facts support the trial court's decision to impose full penalties. Based on undisputed facts, the court found Cintas was on notice that the LWO applied to its operations but made no attempt to comply with the ordinance. Although the court stopped short of finding the company's Labor Code violations to be "willful," the court chastised Cintas's "cavalier approach to fulfilling its contractual and statutory obligations" and suggested its conduct could be characterized as gross negligence or reckless disregard. Cintas also argues the penalties were unfairly inflated because it pays employees on a weekly basis. Under the court's interpretation of former sections 210 and 225.5 that penalties are to be assessed per pay period, Cintas complains its penalties were arbitrarily higher than they would have been if it had paid its employees less often. The frequency of an employer's pay periods can cut both ways, of course, since employees who are paid on a monthly basis will recover lower penalties than employees who receive paychecks more frequently. However, we must presume the trial court considered this argument and determined it did not warrant a reduction of Cintas's penalties. This conclusion was well within the court's discretion.[26]

Finally, the $258,900 penalty assessment is not confiscatory. The court received evidence that Cintas's parent company had $2.81 billion in sales and $272 million in profits during fiscal year 2004. The penalty award is certainly not "astronomical" in comparison. (See, e.g., *City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1318–1319 [92 Cal.Rptr.2d 418] [approving $663,000 penalty for housing code violations, which represented about 28.4 percent of the defendants' net worth].) The penalty award, which totaled less than one-third of the plaintiffs' $804,783 damage award, was also proportional to Cintas's misconduct. (See *Kinney v. Vaccari* (1980) 27 Cal.3d 348, 356 [165 Cal.Rptr. 787, 612 P.2d 877] [punitive assessment should be proportional to defendant's misconduct, sufficient to achieve penalty's deterrent purpose, and not constitutionally excessive].)

In sum, the trial court did not abuse its discretion in declining to reduce the PAGA penalties pursuant to section 2699, subdivision (e)(2).

---

[26] Cintas also asserts, without argument or citation to authority, that the imposition of penalties violates equal protection and the constitutional prohibition on ex post facto laws. These belated throwaway arguments have been waived. (*San Mateo County Coastal Landowners' Assn. v. County of San Mateo, supra*, 38 Cal.App.4th at p. 559; *Downey Savings & Loan Assn. v. Ohio Casualty Ins. Co., supra*, 189 Cal.App.3d at p. 1090 ["A reviewing court need not consider alleged error when the appellant merely complains of it without pertinent argument."].)

### V. *Interest on Unfair Competition Claim*

Cintas argues the trial court erred in awarding prejudgment interest of 10 percent on plaintiffs' successful claim for restitution under the unfair competition law (Bus. & Prof. Code, § 17203 (UCL)). The court awarded prejudgment interest pursuant to Civil Code section 3287, subdivision (a), which provides for interest on an award of "damages certain, or capable of being made certain by calculation." Cintas claims this ruling was erroneous because recovery for unpaid wages under the UCL is considered restitution, not damages. (*Cortez v. Purolator Air Filtration Products Co., supra,* 23 Cal.4th at pp. 177–178.)

We need not reach this issue because our decision can have no practical effect on the judgment. The trial court awarded precisely the same prejudgment interest ($372,546 plus $216.57 per day from April 29, 2006, through entry of judgment) on both the breach of contract claim and the UCL claim. The judgment specifically states that the prejudgment interest award for the UCL claim is "included in, and not in addition to, the prejudgment interest awarded on the Fifth Cause of Action" for breach of contract. Cintas challenged plaintiffs' right to recover on their contract claim, but it did not dispute the award of prejudgment interest on the contract claim. Accordingly, because we are affirming the judgment in plaintiffs' favor on the breach of contract claim, Cintas is now obligated to pay prejudgment interest on the contract damages. Cintas will not be required to pay any additional amount for prejudgment interest on plaintiffs' UCL claim because the judgment directs that this award is subsumed in the award of interest on the contract claim.

" 'It is this court's duty " 'to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it. . . .' " [Citations.]' [Citations.] ' "When no effective relief can be granted, an appeal is moot and will be dismissed." [Citations.]' [Citation.]" (*Vernon v. State of California* (2004) 116 Cal.App.4th 114, 120 [10 Cal.Rptr.3d 121].) Accordingly, because our decision on the matter would be academic, we express no opinion on the availability of prejudgment interest on an award for restitution of unpaid wages under the UCL.

## VI. *Award of Fees and Costs*

Both sides have appealed from the trial court's postjudgment orders awarding attorney fees and costs. Cintas complains the court used an excessive multiplier in calculating attorney fees, and plaintiffs complain the court erred in refusing to allow recovery for certain litigation costs. We reject both arguments.

### A. *Attorney Fee Multiplier*

In calculating the attorney fees to be awarded to plaintiff class, the trial court reviewed detailed billing records and arrived at a "lodestar" figure of $727,000, representing the total attorney hours expended multiplied by a reasonable hourly rate. Cintas has not disputed this amount.

■ A trial court has discretion to adjust the lodestar amount to take account of unique circumstances in the case. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131–1134 [104 Cal.Rptr.2d 377, 17 P.3d 735]; *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 [95 Cal.Rptr.2d 198, 997 P.2d 511].) Some factors the court may consider in adjusting the lodestar include: "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award. (*Serrano* [*v. Priest* (1977)] 20 Cal.3d [25,] 49, 141 Cal.Rptr. 315, 569 P.2d 1303.)" (*Ketchum v. Moses, supra*, 24 Cal.4th at p. 1132.) "The purpose of such adjustment is to fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." (*Ibid.*)

Plaintiffs' motion for attorney fees asked the court to apply a multiplier of 2.0 based primarily on the novelty and difficulty of the issues presented and the successful results counsel achieved for the class, without the time and expense of a trial, on nearly every one of these issues. The trial court agreed with this assessment, though it determined a smaller multiplier of 1.65 was appropriate. The court explained its reasoning as follows: "The instant case presented a number [of] important issues of Constitutional interpretation, as well as interpretation of the Labor Code Private Attorney[s] General Act (Labor Code, § 2699 et seq.), and the Hayward Living Wage Ordinance itself.

These issues, as well as difficult and novel questions of retroactive application and evidentiary burden, were skillfully presented by Plaintiffs' counsel. Based upon the novelty and difficulty of the issues involved, the importance of this case in enforcing the rights to payment of an established living wage, and the high degree of skill displayed by Plaintiffs' counsel—both in establishing a right to summary adjudication of the class claims and in defeating Cintas' Constitutional, statutory interpretation, contract, and evidentiary burden arguments—the Court finds that a multiplier is appropriate. While the hourly rates included in the lodestar here largely reflect the level of skill with which the case was litigated, they do not fully account for the high level of skill necessary to achieve the results here or the relative efficiency with which they were achieved. Most important to the Court's determination on the question of a multiplier, however, are the contingent risks inherent in this litigation, wherein a number of issues of first impression were presented and were largely resolved in plaintiffs' favor." Applying a multiplier of 1.65, the court awarded a total of $1,199,550 in attorney fees.

We review an award of attorney fees for abuse of discretion. (*Serrano v. Priest, supra,* 20 Cal.3d at p. 49.) "The 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.' [Citations.]" (*Ibid.*) The trial court's award here was an appropriate exercise of discretion.

█ Cintas complains the court improperly based the multiplier on "contingent risk" without evidence of "comparative billing data (such as hours billed annually by the firm or amount of income deferred)" or without evidence that plaintiffs' attorneys "sacrificed opportunities for other work" to represent the class. However, Cintas takes an unduly narrow view of the concept of "contingent risk." It is not simply that counsel turned away paid work for a time in order to represent the class, but that counsel risked never receiving compensation *at all.* The claims and defenses in this case raised a significant number of complex legal issues of first impression, and class counsel took a substantial risk that it would not prevail on these issues and thus would not recover a full fee. (See *Horsford v. Board of Trustees of California State University, supra,* 132 Cal.App.4th at p. 400, fn. 11 ["litigation is fraught with uncertainty and even the most scrupulous attorney will 'win some and lose some,' as the saying goes"].) Our courts have recognized that an enhanced fee award is necessary to compensate attorneys for taking such risks: " 'A contingent fee must be higher than a fee for the same legal services paid as they are performed. The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services. . . .' [Citation.] 'A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions. If he is paid no more,

competent counsel will be reluctant to accept fee award cases.' [Citations.]" (*Ketchum v. Moses, supra*, 24 Cal.4th at pp. 1132–1133.) Moreover, in addition to contingent risk, the trial court based the multiplier on other appropriate factors that Cintas does not challenge, such as the novelty and difficulty of the issues presented and the skill and efficiency of class counsel. Finally, contrary to Cintas's assertion, the record is not completely devoid of evidence about the burden imposed on class counsel. Attorneys for the class submitted a declaration stating that the case had "consumed well over 2,100 hours of professional time, which in a small firm such as [theirs] comprises a significant amount of billing."

## B. *Cost Award*

Plaintiffs were awarded all of the costs ($8,174.44) set forth in their memorandum of costs. In addition to these statutory costs, however, plaintiffs sought an award of $65,641.28 for litigation expenses not otherwise available under Code of Civil Procedure section 1033.5. This figure included over $40,000 in expert witness fees. Plaintiffs argued they were entitled to recover such expenses under *Beasley v. Wells Fargo Bank* (1991) 235 Cal.App.3d 1407 [1 Cal.Rptr.2d 459]; however, the trial court rejected *Beasley* as contrary to the weight of authority, including the Supreme Court's decision in *Davis v. KGO-T.V., Inc.* (1998) 17 Cal.4th 436 [71 Cal.Rptr.2d 452, 950 P.2d 567], and ruled such nonstatutory litigation costs may not be recovered.[27]

　In a cross-appeal from the cost award, plaintiffs renew their arguments, again relying solely on the *Beasley v. Wells Fargo Bank* case. However, this holding from *Beasley* was expressly disapproved by the Supreme Court in the recent decision *Olson v. Automobile Club of Southern California* (2008) 42 Cal.4th 1142, 1151 [74 Cal.Rptr.3d 81, 179 P.3d 882] (*Olson*). In *Olson*, the high court held that expert witness fees may not be recovered by the prevailing party in a private attorney general action because the statute that authorizes fee shifting (Code Civ. Proc., § 1021.5) speaks only to attorney fees and does not expressly authorize an award of expert witness fees. (*Olson, supra*, 42 Cal.4th at pp. 1150–1153.) Because plaintiffs here offered no statutory basis for a recovery of the witness fees and other "litigation expenses" not authorized by statute, these sums were not allowable as costs, and the trial court properly refused to award them. (Code Civ. Proc., § 1033.5, subd. (b); *Olson, supra*, 42 Cal.4th at pp. 1150–1153.)

---

[27] The court's order did award plaintiffs an additional $498 in transcript and translation expenses, which it found reasonable under Code of Civil Procedure section 1033.5, subdivision (c)(4). Cintas does not dispute this award. All other litigation expenses were denied.

## DISPOSITION

The judgment and postjudgment orders on appeal are affirmed in their entirety. Plaintiffs shall recover their costs on appeal.

Pollak, J., and Jenkins, J., concurred.

A petition for a rehearing was denied July 2, 2008, and the petition of defendants and appellants for review by the Supreme Court was denied September 10, 2008, S165293.